Opinion
 

 VARTABEDIAN, Acting P. J.
 

 We are called upon to interpret certain provisions of the Public Resources Code aimed at determining responsibility for the expeditious cleanup of nonfunctioning oil wells.
 

 Procedural History
 

 On February 14, 1995, the Supervisor of the California Division of Oil and Gas (Oil and Gas Supervisor) ordered Wells Fargo Bank (plaintiff), as mineral rights owner, to plug and abandon nine oil wells in Raisin City,
 
 *601
 
 Fresno County, pursuant to Public Resources Code sections 3226 and 3237.
 
 [1]
 
 The order also directed plaintiff to remove debris and other equipment as well as clean up the well sites. Based on the provisions of section 3350, plaintiff appealed the order to the Director of the Department of Conservation (hereafter Director) on February 23, 1995. The Director conducted a hearing de novo as required by section 3351 on April 3, 1995. On May 11, 1995, pursuant to section 3353, the Director issued a decision affirming the order.
 

 Plaintiff filed a petition in Fresno County Superior Court on May 22, 1995, for a “Writ of Administrative Mandamus” under Code of Civil Procedure section 1094.5 or, in the alternative, a “Writ of Certiorari” under section 3354, ordering the Director to set aside the order. The court conducted a hearing on September 8, 1995, to consider plaintiff’s petition. On November 21,1995, the court denied the petition. After concluding a writ of certiorari under section 3354 was the appropriate means of judicial review of the Director’s decision, with review limited to those issues set out in section 3355, the court held plaintiff had failed to show any basis for granting the writ of certiorari. In addition, the court found that even if judicial review were appropriate under Code of Civil Procedure section 1094.5, plaintiff failed to establish it was entitled to a writ of mandamus.
 

 Timely appealing the decision of the trial court, plaintiff raises three contentions: (1) the Director erred in issuing the order to plaintiff because it was neither an owner nor an operator of the wells as defined in the relevant statutes; (2) the order should not be enforced against plaintiff as a mere mineral estate owner because it contravenes public policy; and (3) the Director’s unreasonable delay in ordering plugging and abandonment of the wells precludes enforcement against plaintiff as a matter of equity. We affirm.
 

 Factual History
 

 On January 7, 1946, the Citizens National Trust & Savings Bank of Los Angeles (Citizens Bank) granted to Fernando Drilling Co. (Fernando) an oil and gas lease for a certain tract of land in Fresno County that became part of the Raisin City oil field. The lease was for 20 years and thereafter for so long as oil and gas was produced from the land. Under the terms of the lease, Fernando agreed to pay Citizens Bank a royalty of one-seventh of the market value of the oil produced. Fernando assigned the lease to D.H. Graham on January 21, 1946. Production of oil from the lease began in May 1946. A
 
 *602
 
 total of nine wells were drilled which produced oil. These wells continued to produce oil until approximately October 1985, although not all the wells continued to operate during this entire period. One well became idle in 1967; another in 1976; a third in 1977; and a fourth in 1983. The remainder of the wells were idled between September and November 1985. None of the wells were abandoned and plugged in accordance with the procedures prescribed in section 3208.
 

 Citizens Bank’s interest as lessor in the Raisin City oil field passed to Crocker Bank in November 1963 when the two banks merged. In March 1973, Crocker Bank severed the mineral estate from the surface estate and sold the surface estate to the Haupts, a husband and wife.
 

 Between the time the oil and gas lease was assigned and the time all of the wells became idle, it passed through several individuals and entities and was divided into multiple shares. Oil Production Management, Inc., Oklahoma (OPMI) obtained its interest in the lease on July 1, 1983.
 

 On April 1, 1985, OPMI transferred its operating interest iti the leasehold to Oil Production Management, Inc., California (OPMI California). On May 30, 1986, Crocker Bank merged with plaintiff, which became Crocker Bank’s successor in interest and lessor of OPMI’s lease. On August 22, 1985, the deputy supervisor of the Division of Oil and Gas (hereafter Division) issued a notice of violation to OPMI concerning one of the wells operated by it on the leasehold. OPMI did not respond to the notice and did not correct the problem. On April 1, 1986, OPMI California transferred the operating interest in the leasehold back to OPMI. On May 5, 1986, the deputy supervisor issued a second notice of violation to OPMI, for the same well. There is no evidence OPMI ever responded to this notice.
 

 On June 19,1986, OPMI voluntarily filed for bankruptcy under chapter 11 of the Bankruptcy Code. At the time it filed for bankruptcy, it owned between 78 and 81 percent of the working interest in the leasehold, with the remaining interest being owned by six other individuals and entities. At the time it filed for bankruptcy, OPMI estimated its assets as $936,000 and its liabilities as $1,012,020. On August 14, 1986, OPMI filed an application in the bankruptcy court for an extension of time to either assume or reject certain nonresidential leases, including the leasehold in the Raisin City oil field. The court granted the request, extending the time for OPMI to either assume or reject the leases until October 17, 1986. On February 11, 1987, OPMI filed a notice of auction sale of the Raisin City oil field leasehold. Since OPMI represented at the time of the offering for sale it owned 89 percent of the leasehold, it must be assumed OPMI had not released its
 
 *603
 
 interest as of that date. However, on November 19, 1987, OPMI’s attorney, Robert Yaspan, sent a letter notifying the Division that OPMFs right to the leasehold terminated on or about August 20, 1986, citing section 365(d)(4) of the Bankruptcy Code.
 
 [2]
 

 Not convinced that all of the leasehold had been released as a result of the bankruptcy proceeding, the Division wrote to Yaspan on April 25, 1988, concerning the status of the other individuals who allegedly had an interest in the leasehold: Yaspan, Phillip Stephen, and Robert Heck. Yaspan responded that his interest in the leasehold and those of the other individuals named had been transferred to OPMI in 1986. The evidence substantiates that Stephen and Heck did transfer their interests to OPMI in 1986. However, there is no evidence Yaspan transferred his interest to OPMI. The records of the Fresno County Assessor indicate that as of March 30, 1995, Yaspan, along with five other individuals, still held an interest in the leasehold.
 

 On February 10,1992, the Division sent a letter to plaintiff which set forth the Division’s position that OPMI had rejected the leasehold and, therefore, was no longer responsible for any cleanup or taxes on the property. Sometime in the fall of 1993, the Division began to discuss with plaintiff the responsibility for abandoning the nine wells on the leasehold. The Division and representatives of plaintiff had meetings on the subject in April, May, and June of 1994. Initially, plaintiff indicated it intended to abandon the wells as requested by the Division. In August 1994, plaintiff notified the Division it was in the process of attempting to identify previous operators of the wells and that it would then ask the Division to hold those individuals or entities primarily responsible for abandoning the wells. Subsequently, at the request of plaintiff, on November 7, 1994, the Division demanded that the six individuals and entities who retained an interest in the leasehold abandon the wells. The Division received three responses to the letters—two of them denying any responsibility for the wells and the third informing the Division that the holder of the leasehold was deceased.
 

 Based on the information received, the Division concluded the operator of record for the nine wells, OPMI, was bankrupt and there was no other individual or entity which held an operating interest in the leasehold. Because of this conclusion, the Division did not pursue OPMI or the other
 
 *604
 
 individuals or entities further. On February 14, 1995, the Division issued Order No. 678 to plaintiff to plug and abandon the nine wells on the leasehold in accordance with the specifications outlined in that order. On the date the Director conducted the hearing on plaintiff’s appeal, April 3, 1995, the Division was unaware that OPMI’s chapter 11 bankruptcy proceeding closed on February 10, 1995, and OPMI was again doing business in California.
 

 Discussion
 

 I.
 
 Duty to Plug the Wells.
 

 The issue before this court is substantially one of law. There is no real dispute concerning the facts leading up to the issuance of the order to plaintiff to plug and abandon the nine wells. Consequently, we conduct an independent review of the decision of the superior court.
 
 (20th Century Ins. Co.
 
 v.
 
 Garamendi
 
 (1994) 8 Cal.4th 216, 271 [32 Cal.Rptr.2d 807, 878 P.2d 566].)
 

 Plaintiff claims the court erred when it upheld the Director’s decision that plaintiff was responsible for plugging and abandoning the wells in question. The contention boils down to whether plaintiff was an “owner or operator” of the wells as those terms are used in the provisions of the Public Resources Code that deal with oil and gas wells. In order to fully understand the nature of the issue, it is essential to consider the relevant statutes in detail.
 

 A.
 
 California’s statutory scheme.
 

 Division 3 of the Public Resources Code pertains to oil and gas. Article 4 of division 3 addresses the regulation of the operation of oil and gas wells within the State of California. Article 4 contains the requirements with which an individual or entity must comply in order to drill and operate an oil or gas well, including: designation of an agent (§ 3200); notice of acquisition of an interest in a well (§ 3202); notice of intent to drill (§ 3203); record keeping (§§ 3210-3215); and the filing of status and production reports (§§ 3216, 3227). Also included in article 4 are several sections that deal with the plugging and abandoning of oil and gas wells. (§§ 3203, 3208, 3208.1, 3230, 3232, and 3237.) “Plug” and “abandon” are terms of art which are used to describe the procedure that must be followed when a well is no longer used, to ensure that it does not pose a hazard to safety or the environment. “. . . A well is properly abandoned when it has been shown, to the satisfaction of the supervisor, that all proper steps have been taken to isolate all oil-bearing or gas-bearing strata encountered in the well, and to protect underground or surface water suitable for irrigation or farm or
 
 *605
 
 domestic purposes from the infiltration or addition of any detrimental substance and to prevent subsequent damage to life, health, property, and other resources.” (§ 3208.)
 
 [3]
 

 The Oil and Gas Supervisor may direct that deserted wells be abandoned. Suspension of drilling operations and removal of drilling machinery for a period of six months is prima facie evidence the well has been deserted. Further, after April 1, 1973, removal of production equipment or facilities is prima facie evidence of desertion after the lapse of two years. (§ 3237 as it provided at times pertinent to this case.) As is the case with many of the other requirements of article 4, the responsibility to comply with an order under section 3237 to abandon a well lies with the “owner or operator.” (§ 3226.) However, the only definitions of the terms “owner” and “operator” are contained in article 1, sections 3009 through 3011.
 
 [4]
 
 Section 3009 stated at times pertinent to this case: “ ‘Operator’ means any person drilling, maintaining, operating, pumping, or in control of any well.” Former section 3010 provided: “ ‘Owner’ includes ‘operator’ when any well is operated or has been operated or is about to be operated by any person other than the owner.” Former section 3011 stated: “ ‘Operator’ includes ‘owner’ when any well is or has been or is about to be operated by or under the direction of the owner.”
 

 As found in article 1, the definitions of owner and operator, critical to resolution of this case, leave several questions largely unanswered. Not the least of these is whether a holder of the mineral rights to property who grants a sole and exclusive right to drill for oil and gas to a third person qualifies as an “owner” or “operator” of the wells for purposes of the compliance provisions of article 4. Second, and related to that question, is the issue of what point in time the status of an individual or entity with respect to a well is determined. For example, if a well has been deserted and ordered plugged and abandoned by the Division, at what point in time is the status of an individual or entity as an owner or operator determined: when a well ceases production and is deserted or when an order is issued by the Division?
 

 The definitions of owner and operator contained in section 3009 and former sections 3010 and 3011 clearly envision someone who exercises some form of control over or active involvement in the drilling, maintaining or operation of the well. This conclusion is borne out by consideration of the other provisions of article 4. It would be illogical to impose upon someone
 
 *606
 
 who has no authority or responsibility for a well the duty to: file a notice of intent to drill (§ 3203); post an indemnity bond prior to engaging in drilling (§3204); maintain a log of drilling operations (§3211); employ specific safety devices on wells and drilling techniques (§§ 3219, 3220); file monthly production reports (§ 3227); or abandon a well in accordance with the instructions of the Division (§§ 3228, 3229, 3230, and 3232).
 

 The oil and gas lease executed by plaintiff’s predecessors in interest granted the lessee “a profit
 
 a prendre,
 
 a right to remove a part of the substance of the land.”
 
 (Dabney-Johnston Oil Corp.
 
 v.
 
 Walden
 
 (1935) 4 Cal.2d 637, 649 [52 P.2d 237].) This is an interest in real property in the nature of an “incorporeal hereditament.”
 
 (Ibid.)
 
 The lessor retained the right to receive oil royalties as well as “a reversionary interest in the right to drill for and produce oil, dependent upon the termination of the existing leasehold . . . .”
 
 (Id.
 
 at p. 651.)
 

 In the present case, the lessor did not retain any right to control or be responsible for the operation of any of the wells on the property. The terms of the lease granted to the lessee the sole and exclusive right “to drill for, produce, extract, take and remove oil, gas, asphaltum and other hydrocarbons . . . .” The lease also specifically provides: “The possession by the Lessee of said land shall be sole and exclusive, excepting only that the Lessor reserves the right to occupy said land or to lease the same for agricultural, horticultural, or grazing uses, which uses shall be carried on subject to, and with no interference with, the rights or operations of the Lessee hereunder.” It further provides: “All the labor to be performed and materials to be furnished in the operations of the Lessee hereunder shall be at the cost and expense of the Lessee and the Lessor shall not be chargeable with or liable for, any part thereof; and the Lessee shall protect said land against liens of every character arising from his operations thereon.”
 

 The lease placed upon lessees the responsibility for maintaining the production logs for any wells operated on the leasehold. The lease did not reserve to the lessor any authority to prescribe drilling or operating procedures or for the lessor to enter the leasehold to ensure compliance with the provisions of the Public Resources Code. Consequently, while the lease was in effect, neither plaintiff nor any of its predecessors in interest could exercise any control over the operation of the wells on the leasehold. In fact, any attempt by the lessor to enter the property to perform any of the actions required by the statute could be considered an interference with the lessee’s right to enjoyment of the lease. (See
 
 Cassinos
 
 v.
 
 Union Oil Co.
 
 (1993) 14 Cal.App.4th 1770, 1780 [18 Cal.Rptr.2d 574] [“. . . the right of the surface owner is subordinate to an oil and gas lessee, and he may not affect the
 
 *607
 
 mineral estate owner’s right so as to prevent his enjoyment thereof or unreasonably interfere therewith”];
 
 Siemon
 
 v.
 
 Russell
 
 (1961) 194 Cal.App.2d 592, 597 [15 Cal.Rptr. 218] [when lessors surrender rights with respect to property for consideration, the only way they can regain those rights is upon termination or renegotiation of the lease];
 
 Auster Oil & Gas, Inc.
 
 v.
 
 Stream
 
 (5th Cir. 1985) 764 F.2d 381, 390, cert. den. 488 U.S. 848 [109 S.Ct. 129, 102 L.Ed.2d 102 [lessor’s right to enter leasehold to observe operations did not confer right to interfere with operation of the wells]; 1 Williams, Oil and Gas Law (1959) § 202.1, p. 21.)
 

 Because plaintiff’s predecessor in interest received financial benefit from the lease and retained a reversionary interest in the leasehold, the Director claims plaintiff is an “owner” or “operator” of the wells for purposes of the requirements of sections 3226 and 3237. He reaches this conclusion by first focusing on the fact that, at the time the order was issued to plug and abandon the well, the leasehold had allegedly reverted to plaintiff. The Director claims, therefore, plaintiff was the owner and “inchoate operator” of the wells on the leasehold because it retained the exclusive right to drill and produce oil or gas on the property. The Director then argues section 3251 supports this conclusion. The Director claims section 3251 clarifies the definitions of “owner" and “operator” contained in section 3009 and former sections 3010 and 3011 by making it clear they would include any surface or mineral rights owner who obtained substantial financial gain from the well. The Director contends, therefore, the principles of statutory construction support his conclusion that plaintiff was an owner and operator of the wells responsible for their proper abandonment. Our review of this matter tells us that reaching this conclusion is not quite that simple.
 

 Article 4.2 of division 3 of the Public Resources Code was enacted in 1976 to give the state the regulatory power to abandon or reabandon oil and gas wells that constitute public nuisances. (§ 3250.) The cost for abatement of the public nuisance caused by these wells is to be charged to producers of oil and gas in the state.
 
 (Ibid.)
 
 However, the maximum amount that can be expended pursuant to the authority of article 4.2 in any fiscal year is $500,000. (§ 3258.)
 

 Section 3251 further conditions exercise of the authority to abate the public nuisance created by a “hazardous well” on the absence both of a solvent “operator" and of a surface or mineral estate “owner” who derived a substantial benefit from the well.
 

 “For the purposes of this article, an oil or gas well is a ‘hazardous well’ if the well has been determined by the supervisor to presently pose a danger to
 
 *608
 
 life, health, or natural resources and subdivisions (a) and (b) of this section apply. Also, for the purposes of this article, an oil or gas well is an ‘idle-deserted well’ if Section 3237 and subdivisions (a) and (b) of this section apply.
 

 “(a) Regulatory abatement of such a public nuisance is not possible because the last operator that had an economic interest in, or received any benefit from, the well is deceased, defunct, or no longer in business in this state.
 

 “(b) The present surface owner and mineral estate owners derived no substantial financial gain from the well. In making the determination respecting financial gain, the supervisor may seek such information and require such proof of these matters as may be desirable or necessary.” (§ 3251 as it provided at times pertinent hereto.)
 

 Although it does not specifically so state, implicit in section 3251, subdivision (b) is the assumption that an owner of the surface or mineral estate who derived substantial financial gain from the operation of a well is an “owner” who may be required to abandon or reabandon it if the well is deemed hazardous or idle-deserted. Thus, argues the Director, in order to harmonize section 3251 with sections 3226 and 3237, the term “owner or operator” must be read to include a mineral estate owner, such as plaintiff, who derived substantial benefit from the wells. This interpretation is consistent with an apparent intent by the Legislature to restrict the use of the limited resources available to implement article 4.2 to those instances where it is not possible to place the cost on the parties responsible for the nuisance and who derived a benefit from the it.
 

 It is true the interpretation of “owner or operator” proposed by the Director would harmonize sections 3251, 3226 and 3237. However, the interpretation would also cause some incongruous results. If this interpretation of section 3251 is taken to its logical conclusion, a surface or mineral rights owner could be ordered to abandon a well under sections 3237 and 3226 even if the property was still the subject of a valid lease. This would be true even if the surface or mineral rights owner had not retained any right to direct the operation of the well or to perform any function required by the state. In other words, the Director’s interpretation would impose upon a surface or mineral rights owner the responsibility to perform acts which it had no right to do.
 
 [5]
 
 (See
 
 Gannon
 
 v.
 
 Mobil Oil Co.
 
 (10th Cir. 1978) 573 F.2d 1158, 1164, cert. den. 439 U.S. 867 [99 S.Ct. 192, 58 L.Ed.2d 177] [lessee has the duty to plug oil wells upon cessation of operations even over the
 
 *609
 
 objection of the lessor].) Because of this potential incongruity and the lack of cases interpreting these statutes, we find it necessary to explore more fully.
 

 B.
 
 Statutory scheme of other oil producing states.
 

 The problem of plugging and abandoning oil or gas wells for which no one wishes to claim responsibility is not unique to California.
 
 [6]
 
 The problem is a sizable one for the eastern states where the United States oil and gas industry originated and statutes requiring idle wells to be properly plugged and abandoned lagged far behind the development of the industry. It has been estimated that New York has 41,000 orphan wells and that the number in Pennsylvania may be as high as 200,000. (See
 
 Orphans, Foundlings and Wards of the State, supra,
 
 § 19.01.)
 

 The statutory schemes of the states that have enacted abandonment and plugging statutes can be divided into two broad categories: lease development schemes and well development schemes. (See
 
 Orphans, Foundlings and Wards of the State, supra,
 
 § 19.11.) In a lease development scheme,
 
 *610
 
 “owner” is defined as someone “who has the right to drill a tract or pool and appropriate the production for itself or others.”
 
 (Ibid.)
 
 In other words, in states that have adopted a lease development scheme, the definition of the person or entity responsible for abandoning and plugging a well focuses on the right to develop based on ownership of the lease or land. New York and Ohio are states which have adopted a lease development scheme.
 

 In New York, the primary liability for plugging a well: “shall be to the operator unless a contract for the production, development, exploration or other working of the well, to which the lessor or other grantor of the oil and gas rights is a party, places the liability on the owner or on the owner of another interest in the land on which the well is situated.” (N.Y. Envtl. Conserv. Law, § 23-0305.) However, like California, ultimately the “owner or operator” of a well in New York is responsible for the plugging of wells. (N.Y. Comp. Codes R. & Regs., tit. 6, §555.1.) “Operator” is defined as “any person who is in charge of the development of a lease or the operation of a producing well.” (N.Y. Comp. Codes R. & Regs., tit. 6, § 550.3.) “Owner” is defined as “any person who has
 
 the right to drill
 
 into and produce from a pool and to appropriate the oil or gas he produces therefrom either for himself or others or for himself and others.”
 
 (Ibid.,
 
 italics added.)
 

 In Ohio, the responsibility for plugging a well falls upon the owner of a well. (Ohio Rev. Code Ann., §§ 1509.13, 1509.14.) “Owner” is defined as the “person who has the right to drill on a tract or drilling unit and to drill into and produce from a pool and to appropriate the oil or gas that he produces therefrom either for himself or for others.” (Ohio Rev. Code Ann., § 1509.01 (k).)
 

 States such as New York and Ohio, which have adopted a lease development scheme “take an expansive approach to plugging liability . . . .”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.11.) This is apparent from the decision of the Ohio Court of Appeals in
 
 Houser
 
 v.
 
 Brown
 
 (1986) 29 Ohio App.3d 358 [505 N.E.2d 1021]. Appellee Brown, acquired an oil and gas lease by assignment as part of a real estate transaction in 1979. When he acquired the lease to the land, there were already wells on it that had not produced since 1973.
 
 (Id.,
 
 505 N.E.2d at p. 1024.) The division of oil and gas which was responsible for monitoring such wells was aware of this fact since 1973. Brown assigned part of his drilling rights to a third person in February 1980. On September 3, 1983, the owners of the property, the Herolds, disconnected the third person’s surface equipment from the wells.
 
 (Ibid.)
 
 Brown canceled his oil and gas lease on September 18, 1983. An order was issued by the division of oil and gas on January 18, 1984, ordering Brown to plug the wells or put them into production.
 
 (Id.
 
 at p. 1022.) When the division of oil and gas found out Brown had canceled his lease, it issued another order to Sharon Herold as owner of the premises to plug the wells.
 
 (Ibid.)
 

 
 *611
 
 Both Herald and Brown appealed the orders. The oil and gas board of review affirmed the order with respect to Herald, but reversed it with respect to Brown, finding he was not the “owner” of the wells at any relevant time. (505 N.E.2d at p. 1022.) It held Herald was the “owner” at a relevant time—when the division of oil and gas learned of the inability of the wells to produce and the necessity of plugging the wells.
 
 (Id.
 
 at p. 1023.) The court of common pleas affirmed the board’s decision and the chief of the division of oil and gas appealed the decision with respect to
 
 Brown. (Id.
 
 at p. 1023.) Therefore, the decision really involves whether Brown, as a subsequent assignee of the oil and gas lease, can be held responsible to plug wells which he did not drill and which he “inherited” with the lease.
 

 The court held it did not matter that Brown was not the owner of the wells at the time the division of oil and gas issued its order to plug the wells. It held the duty to plug was a continuing duty and once the well became incapable of producing, the duty to plug attached. (505 N.E.2d at p. 1024.) “An owner’s later transfer of the right to produce does not absolve that person of the continuing obligation to plug the well. Therefore, assuming the subject wells were incapable of production in commercial quantities when Brown was assigned the lease in 1979, Brown had a duty at that time to plug the wells. Brown could not escape that duty by cancelling the lease prior to the chief’s January order.”
 
 (Ibid.)
 
 The court held a new lessee or new owner may inherit the duty to plug if he or she acquires a well which is incapable of producing. “The plain language of the statute requires this result, as does the policy of requiring the plugging of unproductive wells. This result is further bolstered by the reality of the oil and gas business, where many wells were drilled during the turn of the century. Several of these companies are now out of business and to hold only the original ‘owner’ responsible for plugging the nonproductive wells would defeat the purpose of the statute.”
 
 (Ibid.)
 

 Since Herald did not appeal, the case does not discuss her duty as the landowner. There is no way to tell if she ever actually controlled the well prior to the time Brown released the lease. However, the court’s comments in dicta concerning Herald are very broad, and we can only assume that court concluded Herald was responsible to plug merely because she ultimately came into possession of the wells by release of the lease by Brown. “The issue as to whether Herald or Brown should bear the expense of plugging the wells is not before us, this being a private matter between them. However, both have a statutory duty to the public to plug the wells. For protection of the public interest, it makes no difference who (Brown or Herald) plugs the wells; the important issue is that one does so promptly. The chief correctly ordered both to plug the wells.” (505 N.E.2d at p. 1024.)
 

 
 *612
 
 In states employing a well development scheme, “operator” is defined as the “person who locates, drills, operates, or abandons any well.”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.11.) States that employ this scheme have a more restrictive view of who is responsible for plugging a well.
 
 (Ibid.)
 
 Three states which embrace the well development scheme of liability are West Virginia, Pennsylvania, and Texas.
 

 In West Virginia, the responsibility for plugging upon cessation of operation of a well is on the “well operator." (W.Va. Code, § 22-6-24.) “Well operator” is defined as “any person or persons, firm, partnership, partnership association or corporation that proposes to do or does locate, drill, operate or abandon any well . . . .” (W.Va. Code, § 22-6-1, subd. (w).) The term “owner” “shall include any person or persons, firm, partnership, partnership association or corporation that owns, manages, operates, controls or possesses such well as principal, or as lessee or contractor, employee or agent of such principal." (W.Va. Code, § 22-6-1, subd. (l).) Both definitions clearly narrow the scope of the definition of owner or operator to a party that actually operates a
 
 well
 
 or directs its operation, rather than focusing on the right of the party vis-á-vis a leasehold or specific parcel of property.
 

 At first blush, Pennsylvania’s statutory scheme identifying the parties who are responsible for plugging idle wells seems to be very similar to that of California. “Upon abandoning any well, the owner or operator thereof shall plug the well in a manner prescribed by regulation of the department. . . .” (Pa. Stat. Ann., tit. 58, § 601.210.) However, the Pennsylvania statutes are much less ambiguous than those of California for two reasons. First, Pennsylvania specifically defines who qualifies as an “owner or operator.” An “owner” is defined as: “[a]ny person who owns, manages, leases, controls or possesses any well or coal property; except for purposes of sections 203(a)(4) and (5) and 210 [the statute dealing with plugging wells] the term ‘owner’ shall not include those owners or possessors of surface real property on which the abandoned well is located who did not participate or incur costs in the drilling or extraction operation of the abandoned well and had no right of control over the drilling or extraction operation of the abandoned well.” (Pa. Stat. Ann., tit. 58, § 601.103.) A “well operator” or an “operator” is defined as the “person designated as the well operator or operator on the permit application or well registration. Where a permit or registration was not issued, the term shall mean any person who locates, drills, operates, alters or plugs any well or reconditions any well with the purpose of production therefrom.”
 
 (Ibid.)
 

 Second, the Pennsylvania statute requiring plugging of idle wells contains a further limitation on the class of owners or operators who are responsible
 
 *613
 
 for plugging. “Where the department determines that a prior owner or operator received economic benefit, other than economic benefit derived only as a landowner or from a royalty interest, subsequent to April 18, 1979, from an orphan well or from a well which has not been registered, such owner or operator shall be responsible for the plugging of the well.” (Pa. Stat. Ann., tit. 58, § 601.210, subd. (a).) Thus, a mineral rights owner, such as plaintiff, who leased the oil and gas rights to a third party and retained no interest other than the right to receive royalties during the existence of the lease and a reversionary right thereafter, would not be held responsible to plug an idle Pennsylvania well.
 

 Texas’s statutory scheme to deal with orphan wells is similar to that of Pennsylvania. The duty to plug a well in Texas rests primarily with the operator. (Tex. Nat. Res. Code Ann., § 89.042, subd. (a).) If the operator cannot be found or is insolvent, the responsibility to plug the well falls upon the nonoperators. (Tex. Nat. Res. Code Ann., § 89.042, subd. (b).) Prior to 1983, if tihe operator and nonoperator (defined below) could not be found or were insolvent, the landowner could be held responsible to plug a well. But, this provision was repealed in 1983. (Tex. Nat. Res. Code Ann., § 89.042, subd. (c).)
 

 An “operator” in Texas is “a person who is responsible for the physical operation and control of a well at the time the well is about to be abandoned or ceases operation.” (Tex. Nat. Res. Code Ann., § 89.002, subd. (a)(2).) Thus, an operator who transfers an unplugged well cannot absolve himself of responsibility merely by transferring it to another. Only if the well is in compliance with state regulations at the time it is sold and the purchaser specifically identifies the idle well and accepts responsibility for it, is the former person no longer considered the “operator” of the well for the purpose of determining plugging responsibility.
 
 (Ibid.)
 
 A “nonoperator” is “a person who owns a working interest in a well at the time the well is required to be plugged pursuant to commission rules and is not an operator as defined in Subdivision (2) . . . .” (Tex. Nat. Res. Code Ann., § 89.002, subd. (a)(3).) However, the definitions of “operator” and “nonoperator” do not include “a royalty interest owner or an overriding royalty interest owner.” (Tex. Nat. Res. Code Ann., § 89.002, subd. (b).)
 

 Thus, the Texas statutory scheme very narrowly defines the class of persons who are responsible for a well. Not only does it incorporate the well development scheme, but restricts the liability of subsequent “operators.” A subsequent owner of an idle well in Texas is not responsible for plugging it unless responsibility for it has been specifically acknowledged and accepted.
 

 The operation of the provisions of the Texas statutes is demonstrated by the decision of the Court of Civil Appeals of Texas in
 
 Railroad Commission
 
 
 *614
 

 of Texas
 
 v.
 
 American Petrofina Co. of Texas
 
 (Tex.Civ.App. 1978) 576 S.W.2d 658. In 1973, American Petrofina (appellee) received an interest in a mineral rights lease by assignment. On the leasehold was an operating gas well. There also existed a well which had been completed in 1962 and had not operated since 1966.
 
 (Id.
 
 at pp. 658-659.) When the appellee obtained the interest in the leasehold, it had previously passed through several other lessees.
 
 {Id.
 
 at p. 658.) Appellee never used the idle well, did not intend to do so, and, in fact, was unaware of its existence.
 
 {Id.
 
 at p. 659.) Relying on the definition of “operator” in the Texas code, the court held American Petrofina Co. could not be ordered to plug the idle well. “It would strain the English language as well as the statute defining an operator to conclude that appellee is the operator of this well.”
 
 {Ibid.)
 

 The
 
 American Petrofina
 
 decision is a classic example of how a well development scheme assigns responsibility. The responsibility for properly plugging and abandoning a well in a well development scheme state, such as Texas, runs with the particular well; not with the leasehold or property on which it is located. Had the
 
 American Petrofina
 
 case arisen in Ohio, which embraces a lease development scheme, there would undoubtedly have been a different result. Consistent with
 
 Houser
 
 v.
 
 Brown, supra,
 
 505 N.E.2d 1021, the appellee, as assignee of the leasehold in Ohio, would have been responsible to plug regardless of whether he ever operated the well or even knew of its existence.
 

 C.
 
 Legislative intent.
 

 Against the backdrop of the statutory schemes of other states, we must determine the intent of the Legislature when it enacted the statutes requiring the plugging and abandoning of idle-deserted wells.
 
 (People
 
 v.
 
 Woodhead
 
 (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154] [“Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.”].) In performing this function we first look to the words used in the statute.
 
 {Ibid.)
 
 “When the language is clear and unambiguous, there is no need for construction.”
 
 {Id.
 
 at pp. 1007-1008.) If the language is ambiguous, the court must consider extrinsic evidence of the Legislature’s intent, including the ostensible “public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]”
 
 (Id.
 
 at p. 1008.)
 

 Considering the provisions of articles 4 and 4.2 objectively, we initially note they are not a model of clarity. The definitions of “owner” and “operator” contained in section 3009 and former sections 3010 and 3011 are redundant, overlapping and ambiguous. There is no indication in the statutes
 
 *615
 
 if these definitions were intended to include a mineral rights lessor or a surface rights owner. Additionally, there is no statute in either article which expressly states a mineral rights owner or surface rights owner who receives substantial financial benefit from the wells can be held responsible for the cost of plugging them. However, this result is implied by the provisions of section 3251. This would lead to the conclusion the Legislature intended to adopt a lease development scheme with respect to assigning responsibility to plug and abandon idle wells. On the other hand, all the other provisions of article 4 describe the duties of the “owner or operator” with respect to a particular
 
 well,
 
 as opposed to a particular
 
 leasehold
 
 or
 
 tract of land.
 
 These provisions, therefore, seem to imply the Legislature intended to adopt a well development scheme. We cannot help but conclude the language of the statutes is ambiguous; we must look elsewhere to determine legislative intent.
 

 One clue to the Legislature’s intent can be obtained by considering the history of the statutes in question. As originally enacted in 1939, section 3226 provided: “Within thirty days after service of an order, pursuant to sections 3224 and 3225, or if there has been an appeal from the order to the board of district commissioners, within thirty days after service of the decision of the board, or if a review has been taken of the order of the board of district commissioners, within ten days after affirmance of the order, the owner shall commence in good faith the work ordered and continue it until completion. If the work has not been commenced and continued to completion, the supervisor shall appoint necessary agents who shall enter the premises and perform the work. An accurate account of the expenditures shall be kept, and the amounts shall be paid from the petroleum and gas fund upon the warrant of the State Controller.
 
 Any amount so expended shall constitute a lien against the property upon which the work is done.”
 
 (Stats. 1939, ch. 93, §3226, p. 1124, italics added.) In 1979, section 3226 was amended to its present form:
 

 “Within 30 days after service of an order, pursuant to Sections 3224 and 3225, or Section 3237,[
 
 7
 
 ] or if there has been an appeal from the order to the director, within 30 days after service of the decision of the director, or if a review has been taken of the order of the director within 10 days after affirmance of the order, the owner or operator shall commence in good faith the work ordered and continue it until completion. If the work has not been commenced and continued to completion, the supervisor shall appoint necessary agents who shall enter the premises and perform the work. An accurate account of the expenditures shall be kept.
 
 Any amount so expended
 
 
 *616
 

 shall constitute a lien against real or personal property of the owner or operator pursuant to the provisions of Section 3423.
 

 “Notwithstanding any other provisions of Section 3224, 3225, or 3237, if the supervisor determines that an emergency exists, he may order or undertake such actions as he deems necessary to protect life, health, property, or natural resources.” (Stats. 1979, ch. 322, § 1, p. 1144, italics added.)
 

 The italicized language in the original version of the statute, which remained a part of the statute until 1979, made the owner of the property on which an idle well was located liable for any cost incurred by the state in plugging and abandoning a well, regardless of whether that landowner derived any financial benefit from the operation of the wells. Thus, although the owner of a well, as defined by former section 3010, was responsible to perform the work ordered by the state, the owner of the property could ultimately be held responsible if the state was required to do the work.
 

 The language of section 3226 permitting the placing of a lien against property to pay for plugging and abandoning a well was clearly a matter considered by the Legislature when it enacted article 4.2 in 1976:
 

 “The Legislature hereby finds and declares that certain hazardous[
 
 8
 
 ] oil and gas wells, as defined in this article, are public nuisances and that it is essential, in order to protect life, health, and natural resources that such oil and gas wells be abandoned, reabandoned, produced, or otherwise remedied to mitigate, minimize or eliminate their danger to life, health, and natural resources.
 

 “The Legislature further finds and declares that, although the abatement of such public nuisances could be accomplished by means of an exercise of the regulatory power of the state, such regulatory abatement would result in unfairness and financial hardship for certain landowners, while also resulting in benefits to the public. The Legislature, therefore, finds and declares that the expenditure of funds to abate such nuisances as provided in this article is for a public purpose and finds and declares it to be the policy of this state that the cost of carrying out such abatement be charged to this state’s producers of oil and gas as provided in Article 7 . . . .” (§ 3250, as enacted by Stats. 1976, ch. 1090, pp. 4932-4933.)
 

 Further evidence of the concern for the financial impact of section 3226 on landowners is provided by the Department of Conservation’s Enrolled Bill Report on the enactment of article 4.2:
 

 “Another example where it would seem unfair to place a financial burden on the property owner is in the case of landowner who does not own the
 
 *617
 
 subsurface mineral rights. The mineral rights owner has the right to enter upon that land to drill a well. The compensation received by the landowner would only be a rental fee for the space occupied by the drilling equipment and any subsequent drilling facility. Under present law, if the operator of that well becomes defunct, the responsibility for abandoning the well would rest with the landowner, even though he had no interest in the well and, in fact, may have objected to its drilling.
 

 “We are trying to emphasize that persons who are not responsible for these old wells on their property or who have not received a substantial economic benefit from the sale of any oil or gas produced from the well should not, in our opinion, be held responsible for the well and subsequent cost of abandonment. It seems only just and fair that the cost for abandonment should be borne by the industry that created the problem.” (Enrolled Bill Memo, to Governor, Assem. Bill No. 4049 (1975-1976 Reg. Sess.) Sept. 16, 1976, pp. 2-3.)
 

 This history of section 3251 suggests that the Legislature intended to
 
 narrow
 
 the class of persons who would be financially responsible for plugging and abandoning an idled well to those individuals who had an economic interest in it or derived a substantial benefit from it. This purpose is further evident in the amendment of section 3226 in 1979, which limited the property against which a lien could be made to that of the “owner or operator.”
 

 Considering the legislative history of sections 3226, 3237, and 3251 in the context of the entire statutory scheme of which they are a part, it must be concluded that articles 4 and 4.2 incorporate aspects of both a well development scheme and a lease development scheme. To the extent the statutes mandate the “owner or operator” of a well to perform the functions required of an oil and gas producer, it is a well development scheme. To the extent the statutes require those who derive financial benefit from the operation of a well, including a mineral interest owner, to accept financial responsibility for properly plugging and abandoning it, they constitute a lease development scheme. We see no irreconcilable conflict resulting from this dual scheme we construe from the statutes in question.
 

 In order to adopt plaintiff’s argument, we would have to conclude subdivision (b) of section 3251 is meaningless. This would be contrary to a basic tenet of legislative interpretation. When attempting to glean legislative intent “[w]e do not presume that the Legislature performs idle acts, nor do we construe statutory provisions so as to render them superfluous. [Citations.]”
 
 (Shoemaker
 
 v.
 
 Myers
 
 (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d
 
 *618
 
 1054, 20 A.L.R.5th 1016].) The history of the enactment of this section, coupled with the enactment and amendments to the other statutes in articles 4 and 4.2, supports the conclusion the Legislature did intend to fix financial responsibility for plugging and abandoning idle wells on parties other than just the parties who physically owned or operated the wells themselves. The Legislature intended to fix responsibility with the parties who benefited from their operation. Plaintiff, as successor in interest to Crocker Bank, fits that description. If the facts of this case had been different and the wells on the leasehold had been producing oil and generating royalties when plaintiff acquired its interest in them, we doubt plaintiff would be denying any interest in them. The fact these nine “foundlings” turned out to be a liability has prompted plaintiff’s denial of responsibility for them. But, the responsibility for wells cannot be based on whether they happen to be profitable at the time the duty to abandon them arises.
 
 [9]
 
 The duty arises because a party obtains a substantial financial benefit as the result of the operation of a well and continues until the well has been properly abandoned and plugged so that it poses no danger to life, health, or natural resources.
 

 We emphasize that plaintiff could be held responsible for the plugging and abandoning of the nine wells even during the period of time before the leasehold was released back to it. Although during this period plaintiff could not be ordered to enter the leasehold to plug and abandon the wells, it could ultimately be held financially liable for any costs incurred by the state in doing so by placing a lien on its mineral interest in the land. Once the leasehold was released back to plaintiff, however, as exclusive owner of the mineral interest, it could be ordered to enter the property to plug and abandon the wells. In other words, we find plaintiff’s responsibility for the plugging and abandoning of the wells arose when it (or, more specifically, its predecessor in interest) first granted the lease in 1946; it was a continuing duty until the date the order to do so was issued. The timing of the order only affected whether plaintiff was personally responsible to perform the task itself or subject to financial liability if the state was required to do so.
 
 [10]
 

 Requiring plaintiff to accept responsibility for the abandonment and plugging of the nine wells is also consistent with public policy. It is estimated there are approximately 1,200 “orphaned” wells in California at this time. The average cost of plugging and abandoning these wells is $20,000.
 
 *619
 
 However, the Division is limited to expenditures of up to $500,000 per year for this purpose. (§ 3258.) Therefore, if the state were to undertake to plug and abandon all of the orphaned wells in the state, it would take almost 50 years at a cost of about $24 million. (See Assem. Com. on Natural Resources, Rep. on Sen. Bill No. 2007 (1995-1996 Reg. Sess.).) It is undoubtedly in the best interests of the citizens of this state to have these wells properly plugged and abandoned as soon as possible in order to prevent any further harm to the environment. Consequently, to the extent a responsible party for an “orphaned” well can be found, that party should be required to perform the required tasks. This policy ensures the limited resources available will be applied as soon as possible to truly “orphaned” wells—those for which no responsible party can be found. In this context, it is neither unjust nor inequitable to hold a party responsible for an “orphan” well from which it has derived substantial financial benefit.
 

 Therefore, the enactment of section 3251 modified the definition of “owner” in section 3226 to include a mineral rights owner who derived a substantial financial benefit from the operation of a well which has been ordered abandoned under section 3237. This is the only interpretation that gives effect to the express intent of the Legislature in enacting the statute and is consistent with the entire statutory scheme of articles 4 and 4.2 of division 3 of the Public Resources Code.
 

 Plaintiff claims it was prejudiced when the Director failed to accept the stipulation of both parties at the hearing that plaintiff was not an “operator” of the nine wells on the leasehold. Plaintiff claims it discontinued further cross-examination of the Division’s witness in reliance on this stipulation. Plaintiff contends the Director exceeded his jurisdiction and abused his authority when he refused to accept the stipulation and held plaintiff was an “operator” as defined by the statute.
 

 During the hearing on April 3, 1995, plaintiff’s counsel was cross-examining Roy Haude, a field engineer for the Division. During the cross-examination, Haude was asked if he considered plaintiff an “operator” of the wells. The following colloquy ensued:
 

 “Q [Counsel for Plaintiff] Okay. I am trying to find out whether you consider Wells Fargo Bank to be the operator of the OPMI lease; did Mr. Heck ever inform you of that?
 

 “Mr. Hager [Counsel for the Division]: I will object on that, is [sz'c] calls for a legal conclusion.
 

 “The Witness: I believe the question before me is, is Wells Fargo Bank the operator? In this case, I would consider them being the operator because that is who I write to.
 

 
 *620
 
 “Mr. Burger: Q You write to them, do you not, on the basis of their being the mineral owner?
 

 “A Correct. They are the mineral rights holder.
 

 “Q Do they ever file papers with the Division, to your knowledge, indicating they’re the operators of the OPMI lease?
 

 “Mr. Hager: In an attempt to shortcut this, we’ll stipulate that Wells Fargo Bank is not the operator.
 

 “Mr. Burger: Thank you. I would move the three documents into evidence as Appellant’s next in order.”
 

 Notwithstanding this stipulation, the Director found plaintiff was an “operator” of the wells. “An additional, independent basis for Appellant’s responsibility for these wells is derived
 
 from
 
 its legal status as an ‘operator.’ While the Supervisor’s Counsel stipulated at the hearing that Appellant was not an operator, this is a conclusion of law that is reserved to the Hearing Officer. As set out previously, ‘Operator’ is defined to include ‘any person in control of any well.’ Pub. Res. Code § 3009. By the Appellant’s own admission, it is presently the holder of the exclusive right to take or capture oil and gas from the property in question. We conclude that Appellant is thus in control of the wells in question, and in addition to its liability as an owner, Appellant has an independent liability for abandonment of the wells as an operator, by definition of law.” The Director made this finding in addition to finding plaintiff was an owner of the wells and, therefore, independently liable for their abandonment.
 

 We need not reach the issue of whether plaintiff is as an “operator.” In passing, we do note that section 3009 defines an “operator” as a party “drilling, maintaining, operating, pumping, or in control of any well.” The language used in the statute contemplates a party taking an active role in the operation of a well, not merely the passive role of possessing the legal right to do so. When OPMI released the leasehold back to plaintiff, the wells on it had not been operating for years. There is no evidence plaintiff ever directed operation of the wells or even knew they existed. As the court in
 
 Railroad Commission of Texas
 
 v.
 
 American Petrofina Co. of Texas, supra,
 
 576 S.W.2d 658 said, to describe plaintiff as an “operator” of the wells “would strain the English language . . . .”
 
 (Id.
 
 at p. 659.) Here, plaintiff’s responsibility for plugging and abandoning the wells is based on its independent status as their “owner.” Therefore, even if the Director erred by failing to accept the stipulation that plaintiff was not an “operator” of the wells, the result would be the same.
 

 
 *621
 
 Plaintiff claims it could not be directed to plug and abandon the nine wells on the leasehold because the last operator of the wells was not “deceased, defunct, or no longer in business in the state,” as required by section 3251, subdivision (a). In essence, plaintiff alleges satisfaction of subdivision (a) of section 3251 is a condition precedent to holding a mineral rights owner responsible for plugging the wells. Since OPMI was the last operator of the wells and it is not defunct, having emerged from bankruptcy in February 1995, “the requirements of PRC section 3251(a) were not satisfied and therefore an action against appellant for regulatory abatement was not authorized.” Plaintiff’s argument fails because it is based on a misinterpretation of the import of section 3251.
 

 Section 3251 establishes the conditions under which the state may abate the nuisance created by a hazardous or idle-deserted well. It does not establish a hierarchy of parties who will be responsible for properly plugging and abandoning these wells. If one of the conditions of section 3251 is not met, the state cannot utilize its own funds to plug and abandon a well. The statute has no impact on the order in which the owners and operators will be required to perform that task. Further, there is nothing in section 3251 or any of the provisions of article 4 or 4.2 that require an operator be defunct or nonexistent before requiring an owner to plug and abandon a well. To the contrary, section 3226 is expressly worded in the disjunctive: “owner or operator.” (Cf. Tex. Nat. Res. Code Ann., § 89.042, subds. (a) & (b) [nonoperators responsible for plugging wells only if operator cannot be found or is insolvent].)
 

 Plaintiff’s argument suggests that the Director should have pursued OPMI, the last operator of the wells, more diligently before seeking to hold plaintiff responsible. This equitable argument is addressed in part III,
 
 post.
 

 II.
 
 Public Policy and Mineral Interests Owner.
 

 Plaintiff contends it is against public policy to hold a mere mineral rights owner responsible for plugging and abandoning wells. Three separate bases are forwarded for this argument, none of which are persuasive.
 

 Plaintiff first contends it is unfair to hold it responsible because its mineral estate had been severed from the surface estate. Plaintiff contends, therefore, its interest was tantamount to an easement on the property. Analogizing to federal cases involving liability of easement owners under
 
 *622
 
 The Comprehensive Environmental Response, Compensation, and Liability Act. (42 U.S.C. § 9601 et seq.) (CERCLA), plaintiff argues it should not be held liable for the conditions on the property over which it holds only an easement. This argument is fallacious.
 

 Plaintiff is correct that its mineral estate, as a
 
 profit á prendre,
 
 is indistinguishable from an easement.
 
 (Gerhard
 
 v.
 
 Stephens
 
 (1968) 68 Cal.2d 864, 880 [69 Cal.Rptr. 612, 442 P.2d 692].) However, this fact does not absolve it of liability for the wells on the leasehold. The interest plaintiff holds is an interest in real property and, in fact, the interest which caused the problem the Director is attempting to correct with the order. Consequently, plaintiff’s reliance on
 
 Long Beach Unified Sch. Dist.
 
 v.
 
 Godwin Liv. Trust
 
 (9th Cir. 1994) 32 F.3d 1364, is misplaced. In
 
 Long Beach Unified Sch. Dist.,
 
 the owner of property which contained a hazardous waste facility asserted the holder of an easement across the property was liable for the cleanup required under CERCLA. (32 F.3d at pp. 1365-1366.) The easement was only to run a pipeline across the property and was not connected to the operation of the hazardous waste facility and did not cause any pollution to the property.
 
 (Id.
 
 at p. 1366.) It was in this context that the Ninth Circuit Court of Appeals ruled the owner of the easement was not responsible for any costs of cleanup.
 
 (Id.
 
 at pp. 1369-1370.) The court noted, however, the result would be different if the pipeline was responsible for the release of hazardous materials. (Id. at p. 1367.)
 

 Unlike the owner of the easement in Long
 
 Beach Unified Sch. Dist.
 
 v.
 
 Godwin Liv. Trust, supra,
 
 32 F.3d 1364, the exercise of plaintiff’s mineral rights interest on the property was the direct and proximate cause of the problems which the Director’s order was intended to cure. It was the use of plaintiff’s “easement” to produce oil on the property that resulted in the wells being dug and operated. Therefore, plaintiff cannot avoid responsibility for them by simply claiming its interest is merely an easement unrelated to the condition of the property.
 

 The second prong of plaintiff’s argument is that public policy is hindered, not furthered, by holding a mineral estate owner liable for the costs of plugging and abandoning a well. Plaintiff claims this theory of liability would only encourage the operators of idle wells to not properly plug and abandon them because of the insouciance of the Director in this case to pursue the last operator of the wells. At the same time, plaintiff argues a decision to hold a mineral estate owner liable will have a chilling effect on the willingness of other such owners in the state to grant oil and gas leases
 
 *623
 
 to third parties, for fear they may ultimately be held liable for plugging and abandoning the wells over which they exercise no control. This argument is unpersuasive.
 

 We repeat that the enactment of section 3251 in 1976, coupled with the amendment of section 3226 in 1979, actually narrowed the class of parties who could be held financially liable for the costs of plugging and abandoning idle-deserted wells. Prior to enactment of those statutes, a lien could have been placed against the property on which a well was located to cover the costs of plugging and abandoning it, regardless of whether the owner derived any financial benefit as a result of its operation.
 

 Additionally, as discussed
 
 ante,
 
 the entire statutory scheme of articles 4 and 4.2 indicates an intent on the part of the Legislature to hold those who benefit from the operation of a well responsible for abating any nuisance it creates. Holding plaintiff responsible for plugging and abandoning the nine wells on the leasehold would further that policy. We reject the notion that holding a mineral estate owner liable for the proper abandonment of a well
 
 in addition
 
 to the operator of the well, will somehow induce the operator to not properly plug and abandon a well. The responsibility of the mineral estate owner does not absolve the operator of responsibility. They are both responsible for the costs of plugging the well, and we know of nothing that will prevent plaintiff from seeking reimbursement from OPMI for any costs plaintiff incurs as a result of the Director’s order. But, just as in
 
 Houser
 
 v.
 
 Brown, supra,
 
 505 N.E.2d at page 1024, that is a private matter. The public interest is in having the wells plugged promptly. (See also
 
 Pro Gas, Inc.
 
 v.
 
 Har-Ken Oil Co.
 
 (Ky. 1994) 883 S.W.2d 485, 488 [“It makes little difference who plugs the wells, the important factor being the protection of the public interest which dictates that appellant post the bonds statutorily required”].)
 

 It also seems highly unlikely the decision to hold plaintiff responsible for the wells in this case will have a chilling effect on other mineral estate owners and hinder the development of oil and gas in the state. It is more likely that such an opinion tends to encourage any future lease of oil and gas rights to include terms to ensure the lessee properly accomplishes the plugging and abandoning of wells once production ceases. (See A
 
 Duty to Plug, supra,
 
 § 20.04[2], p. 20-20.)
 

 Further, the impact of the decision in this case will be limited by the passage of Senate Bill No. 2007, 1995-1996, Regular Session effective January 1, 1997, which substantially changed the definition of “operator” for purposes of sections 3237 and 3251. Section 3237, subdivision (c) now defines “operator” as: “(3) For purposes of this subdivision, ‘operator’ shall
 
 *624
 
 include a mineral interest owner who shall be held jointly liable for the well if the mineral interest owner has or had leased or otherwise conveyed the working interest in the well to another person if in the lease or other conveyance the mineral interest owner retained a right to control the well operations that exceeds the scope of an interest customarily reserved in a lease or other conveyance in the event of a default.” (Stats. 1996, ch. 537, § 7.) Section 3251 has also been amended to incorporate the new definition of “operator.” “For the purposes of this article, an oil or gas well is a ‘hazardous well’ if the supervisor determines that the well is a potential danger to life, health, or natural resources and there is no operator determined by the supervisor to be responsible for plugging and abandoning the well under subdivision (c) of Section 3237. Also, for the purposes of this article, an oil or gas well is an ‘idle-deserted well’ if the supervisor determines that the well is deserted under Section 3237 and there is no operator responsible for its plugging and abandonment under Section 3237.” (Stats. 1996, ch. 537, § 9.)
 
 [12]
 

 The most recent amendment of section 3237 is also significant because it supports the conclusion plaintiff is responsible for plugging and abandoning the nine wells. Since the amendment specifically exempts mineral estate owners who only retain a royalty interest in the property from this responsibility, prior to the amendment the Legislature must have intended they would be responsible.
 

 In a supplementary letter brief, the Director takes a contrary position. He argues that even if Senate Bill No. 2007 were applicable, it would have no effect on the liability of plaintiff. He reaches this conclusion based on the assumption plaintiff qualifies as an “operator” under the new definition contained in section 3009. He claims this is true because OPMI released the leasehold back to plaintiff. Therefore, although plaintiff never operated the wells or intended to operate the wells, it has the right to do so and thus qualifies as an “inchoate operator.” The Director also argues the limitation on the liability of mineral rights owners for plugging and abandoning wells in section 3237, subdivision (c)(3), as amended by Senate Bill No. 2007, does not apply to plaintiff. Again he reaches this conclusion based on the fact OPMI released the leasehold back to plaintiff. Therefore, argues the Director, at the time the Oil and Gas Supervisor issued the order to plug and abandon, plaintiff was not just the holder of a mineral interest who was entitled to royalty payments; it was an “operator” (albeit inchoate) as now defined by section 3009.
 

 In passing, we analyze this position taken in order to assist in cases similar to the instant one, but arising after the effective date of the new statutory
 
 *625
 
 changes. There are several problems with the Director’s argument. Not the least of these is the plain language of section 3237, subdivision (c)(3): “(3) For purposes of this subdivision, ‘operator’ shall include a mineral interest owner who shall be held jointly liable for the well if the mineral interest owner
 
 has or had leased
 
 or otherwise conveyed the working interest in the well to another person if in the lease or other conveyance the mineral interest owner retained a right to control the well operations that exceeds the scope of an interest customarily reserved in a lease or other conveyance in the event of a default.” (Italics added.) The logical conclusion from inclusion of the words “has or had leased” in the statute is that the Legislature intended the exemption to apply to oil and gas leases presently in existence, or which previously existed when the well was operating. Any other interpretation of the provision would make the use of the past tense (“had”) superfluous. In other words, the mere fact a lease has terminated and the interest has reverted to the mineral rights owner does not mean that mineral rights owner is responsible for plugging and abandoning the wells, if the only interest it had during the operation of the wells was an entitlement to royalty payments. Any other interpretation of the statute is illogical and “would strain the English language as well as the statute defining an operator . . . .”
 
 (Railroad Commission of Texas
 
 v.
 
 American Petrofina Co. of Texas, supra,
 
 576 S.W.2d at p. 659.)
 

 Additionally, the Director’s argument would put mineral interest owners at the mercy of unscrupulous operators. In order to avoid liability, or at least obtain a right to contribution from the mineral interest owner, all an operator would have to do is release a leasehold back to the mineral interest owner after the wells were no longer productive, but before the Oil and Gas Supervisor issued an order to plug and abandon them. In this way, the mineral interests owner could not claim the limitation of section 3237, subdivision (c)(3), because it would meet the Director’s definition of an “inchoate operator.” This cannot be the result the Legislature intended when it enacted the most recent change to the statutes. This conclusion is supported by considering the other changes to the provisions of division 3 of the Public Resources Code enacted at the same time.
 

 Section 3201, which deals with the transfer of a well, was also revised at the same time as section 3237. This amended statute includes a specific limitation on the ability of an operator to absolve himself of liability for a well merely by transferring it to another party. “. . . The operator shall not be relieved of responsibility for the well until the supervisor or the district deputy acknowledges the sale, assignment, transfer, conveyance, exchange, or other disposition, in writing, and the person acquiring the well is in compliance with Section 3202. . . .” (§3201.) At the same time, section
 
 *626
 
 3202 was also amended and now provides the acquisition of the “right to operate a well” will “not be recognized as complete by the supervisor or the district deputy” until the new operator fulfills certain requirements. (§ 3202.) Taken together, these provisions seem intended to prevent an operator from avoiding direct responsibility for a well merely by transferring it to another party—which would logically include a relinquishment of a leasehold back to the mineral rights owner.
 

 The new provisions ensure the Oil and Gas Supervisor (as well as an unwary mineral rights owner such as plaintiff) is aware of a planned transfer of ownership of a well and maintains the original operator’s liability for the well until the Oil and Gas Supervisor acknowledges the sale. This fact is critical because the revised provisions of section 3237 place primary liability on the “current operator” of the well: “(c)(1) The current operator, as determined by the records of the supervisor, of a deserted well that produced oil, gas, or other hydrocarbons or was used for injection shall be responsible for the proper plugging and abandonment of the well. . . .” (§ 3237.)
 

 Furthermore, the provisions of section 3237 now provide for a presumption that a well has been deserted “[i]f a person who is to acquire a well that is subject to a purchase, transfer, assignment, conveyance, exchange, or other disposition fails to comply with Section 3202.” (§ 3237, subd. (a)(3)(E).) In other words, if these amended sections were applicable at the time OPMI relinquished the leasehold, plaintiff or its predecessor in interest would not have been responsible for the well as a “current operator” unless the Oil and Gas Supervisor knew of and acknowledged the transfer and plaintiff complied with the requirements of section 3202. Thus, contrary to the Director’s argument, OPMI could not bestow responsibility for plugging and abandoning the wells by merely releasing the leaseholds back to plaintiff under the revised provisions of the Public Resources Code. This result is consistent with the concept that the parties responsible for plugging and abandoning a well should be the parties who were actively involved in its operation.
 

 Finally, plaintiff claims it should not be considered the owner of the wells because the surface owner, not plaintiff, now owns the wells. Plaintiff reasons that since OPMI did not remove the well casings, fixtures and other equipment on the leasehold within a reasonable time, the ownership of this property passed to the surface estate owners, the Haupts. Thus, argues plaintiff, the surface estate owners also became owners of the wells. Plaintiff’s argument fails because it confuses the right to claim personal property that has been abandoned on a leasehold with the right to claim the leasehold when it has been abandoned or released.
 

 
 *627
 
 As previously discussed, the ownership of mineral rights in California is considered an interest in real property in the nature of an “incorporeal hereditament.”
 
 (Dabney-Johnston Oil Corp.
 
 v.
 
 Walden, supra, 4
 
 Cal.2d at p. 649.) This interest involves the exclusive right to drill and produce oil.
 
 (Ibid.)
 
 Therefore, when OPMI released the leasehold back to plaintiff, it once again became the holder of this interest. The fact the law permits the owner of the surface estate to claim any personal property or fixtures left by the lessee does not equate to ownership of the wells. In other words, while the surface estate owner could claim the fixtures and equipment left by OPMI, it could not use them to operate the wells already in place. That right remained with plaintiff, along with the right to enter the property to operate the wells. (4 Cal.2d at p. 650.) The severance of the surface estate, therefore, had no effect on plaintiff’s liability for plugging and abandoning the wells.
 

 III.
 
 The Application of Equitable Estoppel and Laches.
 

 Plaintiff finally contends the Director should not order it to plug and abandon the nine wells as a matter of equity. It claims the failure of the Director to pursue the actual operators in a timely manner should preclude any attempt to hold plaintiff responsible at this late date. Plaintiff supports this contention by pointing to the fact at least 1 of the wells was idle for about 28 years, and 3 others for 12 to 19 years, at the time plaintiff was ordered to plug and abandon all the wells. Plaintiff argues it is unfair for the actual operators, including OPMI, to be allowed to walk away from their responsibility for these wells, while plaintiff is required to bear the entire burden for plugging and abandoning them.
 

 First, as discussed
 
 ante,
 
 in part II, we reject any notion that the Director must first exhaust every effort to have an “operator” of the wells to plug and abandon them before proceeding against an “owner.” The responsibility of the “owners and operators” of an oil or gas well is joint and several. There is no hierarchy of responsibility created by the statutes.
 

 Although plaintiff has not specifically stated the grounds upon which it seeks equitable relief, during the administrative hearing plaintiff argued it was making “an estoppel argument.” At the trial court, plaintiff characterized this argument as either “an estoppel or a laches.” The trial court addressed the argument as one raising both equitable estoppel and laches. Therefore, we review the claim on both grounds.
 

 A.
 
 Equitable estoppel
 

 “The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a
 
 *628
 
 state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment.”
 
 (Strong
 
 v.
 
 County of Santa Cruz
 
 (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].)
 

 In order to prevail on a defense of equitable estoppel, four elements must be established: “1) the party to be estopped must be apprised of the facts; 2) that party must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; 3) the other party must be ignorant of the true facts; and 4) he must rely upon the conduct to his injury. [Citation.]”
 
 (Morrison
 
 v.
 
 California Horse Racing Bd.
 
 (1988) 205 Cal.App.3d 211, 217 [252 Cal.Rptr. 293].) We need go no further than consideration of the fourth element to find plaintiff’s claim of equitable estoppel fails. Plaintiff obtained its interest in the leasehold as a result of its merger with Crocker Bank in 1986. There is no evidence plaintiff ever relied upon any conduct or representations by the Director with respect to the nine wells in accepting the leasehold as part of the merger. In fact, the evidence establishes plaintiff was unaware of its interest in the leasehold until contacted by the Division concerning the need to plug and abandon the nine wells. Plaintiff, therefore, cannot claim equitable estoppel.
 

 B.
 
 Laches.
 

 “[I]t appears that courts have inherent power independent of statutory provisions to dismiss an action on motion of the defendant where it is not diligently prosecuted. [Citations.] The policy to expedite justice underlying the rule, exists where the proceeding is before a local administrative agency exercising quasi judicial functions such as the board in the instant case. By analogy a proceeding before such a board should be dismissed where an unreasonable time has elapsed—where the proceeding is not diligently prosecuted.”
 
 (Steen
 
 v.
 
 City of Los Angeles
 
 (1948) 31 Cal.2d 542, 546-547 [190 P.2d 937].)
 

 In order to prevail on a defense of laches in an administrative proceeding, plaintiff must establish an “unreasonable delay plus either acquiescence in the act about which the complainant complains or prejudice to the party asserting the equitable defense resulting from the delay. [Citation.]”
 
 (Chemical Specialties Manufacturers Assn., Inc.
 
 v.
 
 Deukmejian
 
 (1991) 227 Cal.App.3d 663, 672 [278 Cal.Rptr. 128]; accord,
 
 Brown
 
 v.
 
 State Personnel Bd.
 
 (1985) 166 Cal.App.3d 1151, 1158 [213 Cal.Rptr. 53].) Additionally, “[w]here there is no showing of manifest injustice to the party asserting laches, and where application of the doctrine would nullify a policy adopted for the public protection, laches may not be raised against a governmental
 
 *629
 
 agency. [Citation.]”
 
 (Morrison
 
 v.
 
 California Horse Racing Bd., supra, 205
 
 Cal.App.3d at p. 219.)
 

 Objectively considering the evidence presented at the hearing, we conclude the Division’s enforcement of the requirements of the owners and operators of the nine wells was something less than diligent. As correctly noted by plaintiff, one of the wells was idled in 1967 and remained so at the date of Order No. 678. Another well was idled in 1976, a third in 1977, a fourth in 1983, and the remaining five wells in 1985. The Division was aware of this history as evidenced by the information on each well contained in Order No. 678, as well as the requirement of section 3227 that monthly well statements be filed with the Oil and Gas Supervisor. However, the first attempt to require anyone to properly plug and abandon any of the wells appears to have been in 1986 or 1987 when the Division contacted OPMI concerning the wells, despite the fact the version of section 3237 applicable during the time period relevant to the operation of the wells provided removal of production equipment or facilities for a period of two years constituted prima facie evidence of desertion of a well.
 
 [13]
 

 The Director claims the Division acted reasonably when it did not order the plugging and abandonment of any of the wells until all of them were idle because of the potential the wells could have been put back into operation. The Director argues that so long as the “lease” is active, there is the potential that changes in the world supply of oil and increased prices could induce an operator to bring an otherwise unprofitable well back into production. If the Division had dotie otherwise, the order may have been premature and counter to the purposes of section 3106 to increase the recovery and production of oil in the state. However, the evidence in the record belies this argument.
 

 First, there is no evidence any operator of the nine wells ever attempted to bring any well back into operation after they were idled or that the Division was ever informed of this fact. The summary of the production reports indicate a sharp drop in production beginning in August 1976, which continues until January 1982. Production then increased for about a year and then dropped off again sharply in January 1983. Certainly, at some point when the monthly reports indicated wells were being idled and production dropped from over 1,000 barrels a month to 340 or even zero, an inquiry should have been made concerning whether the operators intended to ever continue to operate the idle wells.
 

 
 *630
 
 Second, all of the statutes speak in terms of the obligations of an owner or operator with respect to a particular well—not with respect to a leasehold or field. There is nothing in the statutory scheme which precludes the Division from ordering one well plugged and abandoned when others on a specific leasehold or in a specific oil field are operating.
 

 Although there is no requirement for the Division to proceed against the owner of a well before turning to an owner of the mineral rights, we cannot help but note that the Division’s failure to adequately pursue OPMI negatively impacts any claim of diligence. OPMI had been the operator of the wells since it acquired its interest in July 1983. It reaped the lion’s share of any profits made from then until the date all the wells became idle. Further, during the time it exercised its right under the lease to produce oil from the wells, it had the sole right to direct the operation of the well and the obligation to properly plug and abandon any well which it deserted. The Division recognized this fact when it first turned to OPMI to plug and abandon the well. However, the effort to hold OPMI responsible for the nine wells was haphazard and apparently abandoned by the Division based on a misunderstanding of the impact of the chapter 11 bankruptcy which OPMI fortuitously filed in June 1986.
 

 When the engineer from the Division responsible for the nine wells on the leasehold in the Raisin City oil field was questioned concerning his understanding of OPMI’s bankruptcy petition, he stated:
 

 “Q [Mr. Burger] When you received information that OPMI had filed Chapter 11 bankruptcy, does that translate to the operator being defunct in your mind?
 

 “A [Mr. Haude] When you go bankrupt you go away, you’re gone.
 

 “Q And I realize you’re an engineer. Has anyone—have you ever had any conversation with respect to the difference between a Chapter 7 bankruptcy and a Chapter 11 bankruptcy?
 

 “A I don’t do bankruptcies.
 

 “Q So you don’t know the difference between the Chapter 7 bankruptcy in general, versus the Chapter 11 bankruptcy?
 

 “A There are different types of bankruptcies. Some you reorganize. Some you go away.
 

 “Q Okay. All right. And do you have a feeling, as you sit here today, which is which? If I were to represent to you that at least two of the choices
 
 *631
 
 someone has when they go bankrupt: one is a Chapter 7, and one is a Chapter 11.
 

 “A I believe I could follow the logic.
 

 “Q No. The question I asked, I believe, was do you know the difference if I tell you that, one, where someone, as you say, goes away, as a certain number; and the other, where they reorganize as a number. Do you know, generally, which is which?
 

 “A I know the difference of [szc] between dissolved of one’s debts and working out a payment plan with a creditor.
 

 “Q Okay. And do you know which OPMI did?
 

 “A No, I do not.
 

 “Q Would it surprise you if I told you that OPMI did the reorganization type of bankruptcy and made a payment plan with the other creditors?
 

 “A Repeat that.
 

 “Q I said, would it surprise you if I were to tell us [szc] you that OPMI did just that type of bankruptcy?
 

 “A It would be very surprising.
 

 “Q Would it also be surprising to you if I told you that OPMI exists today?
 

 “A I have no evidence that it exists.”
 

 Earlier, Mr. Haude had testified the Division concluded OPMI was defunct, based on the letter from Mr. Yaspan that the company had filed for bankruptcy under chapter 11.
 

 The Division relied solely on the Yaspan letter of November 19, 1987, to conclude OPMI was defunct. There is no evidence the Division contacted anyone else to confirm this fact or ascertain OPMI’s status from the bankruptcy court. Had they done so, they would have determined the representation by Mr. Yaspan that OPMI’s interest in the leasehold containing the nine wells terminated on August 20, 1986, was misleading. The records of OPMI’s bankruptcy proceeding indicate that as late as February 11, 1987, OPMI represented it owned an 89 percent interest in the leasehold which.it was attempting to sell at auction.
 

 Had the Division done further investigation, it would also have learned that OPMI’s institution of chapter 11 bankruptcy proceedings did not operate
 
 *632
 
 as a stay “of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit’s police or regulatory power.” (11 U.S.C. § 362(b)(4).) Consequently, there was no impediment to ordering OPMI to plug and abandon the wells while the bankruptcy proceeding was pending. Finally, had the Director further pursued OPMI, it would have been aware that OPMI’s bankruptcy proceedings were closed on February 10, 1995, four days before it issued Order No. 678.
 

 While the Division did not diligently act to have the subject wells properly plugged and abandoned—especially with respect to the four wells that were idled between 1967 and 1983—the inquiry does not end there. Laches does not bar the enforcement of Order No. 678 against plaintiff unless there is evidence the Division acquiesced to absolving plaintiff of responsibility for plugging and abandoning the wells or plaintiff suffered prejudice resulting from the delay in ordering the wells plugged and abandoned. There is no evidence the Division ever agreed or acquiesced plaintiff was not responsible to plug and abandon the wells. Therefore, the issue comes down to whether plaintiff has been prejudiced by the Division’s delay in issuing Order No. 678. “It is not so much a question of the lapse of time as it is to determine whether prejudice has resulted. If the delay has caused no material change
 
 in statu quo, ante,
 
 i.e., no detriment suffered by the party pleading the laches, his plea is in vain.”
 
 (Brown
 
 v.
 
 State Personnel Board
 
 (1941) 43 Cal.App.2d 70, 79 [110 P.2d 497].)
 

 Here, plaintiff and its predecessors in interest were responsible for plugging the wells because they derived a substantial financial benefit from them. This was the intent of the Legislature when it enacted section 3251 in 1976. This fact is true whether the order to plug and abandon the wells was made before or after the leasehold was released by OPMI, and regardless of to whom the Division first issued the order.
 

 The delay in issuing Order No. 678 did not prejudice plaintiff by creating a liability it did not otherwise have—plaintiff and its predecessors in interest were always liable for the proper plugging and abandoning of the wells. Had the order been issued at a time when the wells on the leasehold were actively being operated by the lessee, the plaintiff’s liability would have come as the result of a lien on its mineral estate if the operator did not comply. However, the burden would be no less than it is now that plaintiff has been ordered to incur the cost of plugging and abandoning the wells directly. In either case, plaintiff is subject to the duty to comply with the order and bears the financial burden for doing so. Finally, plaintiff is free to seek contribution from OPMI or any other owner of an operating interest in the wells for any expense it incurs in complying with Order No. 678. But, as stated before,
 
 *633
 
 this is a private matter between plaintiff and the other parties having an interest in the leasehold. The state’s interest is in having the nine wells properly plugged and abandoned as quickly as possible.
 

 We conclude plaintiff has failed to establish it has been prejudiced as a result of the Division’s delay in issuing the order to plug and abandon. Therefore, it cannot claim laches bars enforcement of Order No. 678. Additionally, there is no manifest injustice in requiring a party which has reaped financial benefit from the operation of oil wells to participate in making those same wells safe for the people and environment of the state. Consequently, even assuming the elements of the defense of laches had been established, we should not apply it because it would nullify the policy of articles 4 and 4.2 to protect the public by ensuring the maximum number of hazardous and idle-deserted wells are plugged and abandoned as quickly as possible.
 

 Disposition
 

 The judgment is affirmed. Costs on appeal are awarded to respondents.
 

 Thaxter, J., and Buckley, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied June 11, 1997. Baxter, J., did not participate therein.
 

 [1]
 

 All further statutory references are to the Public Resources Code unless otherwise indicated.
 

 [2]
 

 "Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.” (11 U.S.C. § 365(d)(4).)
 

 [3]
 

 Other state statutes cited
 
 post
 
 use the term “abandon” to describe wells which are defined as “idle-deserted” under the California statute. In order to avoid confusion, the term “abandon” will only be used when the meaning ascribed to it in section 3208 is intended.
 

 [4]
 

 Sections 3010 and 3011 were repealed by Statutes of 1996, chapter 537, sections 1 and 2.
 

 [5]
 

 Several states have expressly provided for persons other than the owner or operator of a well to enter onto upon property to plug an idle or deserted well and recover the costs of
 
 *609
 
 doing so from the owner or operator. (See Pa. Stat. Ann., tit 58, § 3; Tex. Nat. Res. Code Ann. § 91.013; W.Va. Code, § 22-6-32.) California does not have comparable legislation.
 

 [6]
 

 These wells are often referred to as “orphans.” However, it has been suggested a more expanded glossary of terms is necessary to accurately describe all of the possible categories of wells now classified as orphans. (See Pierce,
 
 Orphans, Foundlings and Wards of the State: Plugging Liability for Orphan and Abandoned Wells in the Eastern States
 
 (1993) 14 E. Min. L. Inst., ch. 19, § 19.02 (hereafter
 
 Orphans, Foundlings and Wards of the State).)
 
 These categories are:
 

 (a) Orphans: “[I]dle and unplugged wells or improperly plugged wells for which no existing solvent responsible entity is known or can be found.”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.02.)
 

 (b) Foundlings: “[I]dle and unplugged wells originally drilled by one entity for which a second, currently existing and solvent, entity is wittingly or unwittingly responsible. . . . [T]he arrival of a foundling well at the doorstep may come as a surprise to some entities deemed responsible for their plugging.”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.02.)
 

 (c) Latchkeys, Love Children, and Home Aloners: “[Ujnplugged wells not currently producing and unproduced through the defined statutory abandonment period, either because of (1) operational emphasis on other more economic operations (‘latchkeys’); (2) the deliberate refusal of the responsible operator to acknowledge and assume the plugging liability (‘love children’); or (3) the propensity of the responsible party, having acquired the fruits of the operation, simply to retreat to the condo in Boca Raton leaving the uneconomic well unplugged and unattended (‘home aloners’).”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.02.)
 

 (4) Wards of the State: “[A]ny well from any of the above classes for which the state statute does or may place primary plugging responsibility on an agency of state government.”
 
 (Orphans, Foundlings and Wards of the State, supra,
 
 § 19.02.)
 

 From the perspective of the plaintiff, the nine wells in the Raisin City oil field would best be described as “foundlings,” while they would undoubtedly be “home aloners” with respect to OPMI.
 

 [7]
 

 The statute was amended in 1972 to add the words, “or section 3237.” (Stats. 1972, ch. 898, § 21, p. 1599.)
 

 [8]
 

 This statute was amended in 1977 to include “idle-deserted” wells. (Stats. 1977, ch. 112, § 6, p. 547.)
 

 [9]
 

 “Thus, both the dry hole and the gusher share the same ultimate fate, sooner or later the well must be plugged.” (Mitchell, A
 
 Duty to Plug—The Deep Pocket Theory
 
 (1988) 9 E. Min. L. Inst., ch. 20, § 20.01, p. 20-2 (hereafter A
 
 Duty to Plug).)
 

 [10]
 

 At the time plaintiff’s predecessors in interest first assigned the lease in 1946, section 3226 was in existence, having been enacted in 1936. Therefore, it cannot be said plaintiff was not on notice that a lien could be placed against its property if remedial work required by the Director was not performed by OPMI.
 

 [12]
 

 Plaintiff has requested this court take judicial notice of the passage and approval of Senate Bill No. 2007, as well as the provisions contained in it. This information qualifies for judicial notice under either Evidence Code section 451 or 452 and, therefore, the request is granted.
 

 [13]
 

 The version of section 3106 applicable during the time period relevant to the operation of the wells provided, in pertinent part: “The supervisor shall so supervise the drilling, operation, maintenance, and abandonment of wells as to prevent, as far as possible, damage to life, health, property, and natural resources. . . .” (Stats. 1972, ch. 898, § 7, p. 1595.)