[No. B166080. Second Dist., Div. Six. Apr. 8, 2004.]

SETH BLACKBURN et al., Plaintiffs and Respondents, v.
ANDREW CHARNLEY et al., Defendants and Appellants.

## Counsel

Paul J. Weinberg for Defendants and Appellants.

Ogden & Fricks, Roy E. Ogden and Sue N. Carrasco for Plaintiffs and Respondents.

## Opinion

**COFFEE, J.**—Andrew Charnley and Charnley Gustason Development Company, Inc. (collectively Charnley) appeal from a judgment awarding respondents, Seth Blackburn and Chris Goetsch Blackburn and Jeffery and Laurie Thomas, specific performance of real estate purchase agreements and attorney's fees. Charnley contends the trial court erred in (1) entering a judgment for specific performance because the purchase agreements were not sufficiently certain and definite to be enforceable; (2) awarding contractual attorney's fees to the Blackburns and Thomases; and (3) including language in the statement of decision indicating that the real estate brokers involved in the transaction did not breach their standard of care. We affirm.

### Factual and Procedural Background

Charnley purchased tracts 1785 and 1926, both in Templeton, for the purpose of subdividing them. Michelle Smith, a licensed real estate agent

with Country Real Estate, was Charney's exclusive real estate agent. She assisted Charnley in purchasing tract 1785 and buying or selling approximately 100 other properties. A standard California Association of Realtors (CAR) purchase agreement was used for his purchase of tract 1785.

In December of 1999, Smith entered into two exclusive authorization and right to sell agreements with Charnley to sell lots 1, 2, and 3 in tract 1785 and 18 townhome units to be constructed on tract 1926. Charnley instructed her to list the three lots and the homes to be constructed on tract 1785 for a sales price of $184,900 each, and the townhome units in tract 1926 for a sales price of $164,900. When Smith signed the exclusive listings for these properties, Charnley did not tell her that he did not have the Department of Real Estate's approval for these subdivisions, as evidenced by a final public report. Charnley did not receive the final public report until December 2001.

In February of 2000, the Blackburns contacted Smith and discussed the three lots available in tract 1785. Smith provided them with a sheet describing the standard features of the homes to be constructed on the three lots, the site plans, the floor plan callouts, and elevation plans. The Blackburns decided to make an offer on lot 2 at the purchase price of $184,900. The home was to consist of 1448 square feet, with three bedrooms and two bathrooms. The Blackburns' offer asked that the seller pay closing costs and include rain gutters. With Smith's assistance, the Blackburns made their offer on a standard preprinted purchase and sale agreement used by CAR. Smith then communicated the offer to Charnley, who countered with an increased purchase price of $188,000. Chris Blackburn testified that she and her husband agreed to that price, inserted it into the preprinted purchase and sale agreement, and the couple and Charnley signed the agreement. The purchase agreement provided that the couple would deposit $1,000 into escrow "once construction begins," seller would pay $5,000 of the buyers' closing costs, and escrow would close "upon completion" of construction.

A few days later, the parties executed a document entitled "Amendment to Real Estate Deposit Receipt," which refers to the "Contract dated 2/22/00" between Charnley as seller and the Blackburns as buyers. This amendment provided in part that the buyers were aware that: (1) they were purchasing a "to be completed" "spec" home and not a custom home; and (2) plans were provided to the buyers for information purposes only and changes in detail and/or specific layouts and dimensions of the residence may be necessitated during construction.

In March of 2000, William and Patti Van Orden (not parties to this action) submitted an offer to purchase lot 3 for $184,900, the price advertised in the standard features sheet. They were assisted by Sheryle Machado, a licensed

real estate associate of Country Real Estate, and received a site plan for lot 3, floor plan callouts, elevation callouts, and a map of the lots. The Van Ordens' purchase agreement was identical to the Blackburns' and was written on the same five-page standardized form used by CAR. Machado inserted as a contingency of the sale that, upon receipt of the public report, a deposit of $1,000 would be paid by the buyer, contingent upon the buyer's approval of the public report. She received a copy of the offer back from Michelle Smith signed by Andrew Charnley. Ultimately, the Van Ordens paid $205,730 for their house, due to nearly $20,829 in upgrades and extra landscaping. These adjustments appear on change orders, dated January 21, 2002, which reference the March 2000 CAR form purchase contract.

In March of 2000, respondents Jeffery and Laurie Thomas submitted an offer for lot 1 on tract 1785 with the assistance of Sheryle Machado. The Thomases were also given Charnley's standard features sheet, site and elevation plans, and floor plans for the house to be built on lot 1. Their purchase agreement consisted of the same five-page standardized CAR form used by the Blackburns and the Van Ordens. In April of 2000, the Thomases received a counteroffer from Charnley, increasing the purchase price to $196,000. They executed the agreement at the increased price. Their purchase agreement states that Charnley agreed to sell them real property in Templeton described as lot 1, Old Country Road, that the Thomases would deposit $1,000 into escrow "upon receipt and approval of the Public Report" and the closing date would be determined once construction began. The agreement incorporated by reference the standard features sheet provided to the Thomases.

Michelle Smith testified that she ultimately sold all but one of the townhomes on tract 1926. Pursuant to Charnley's request, she delivered the CAR purchase agreements to the bank for his use in obtaining a construction loan. She testified that Charnley never discussed taking reservations on tracts 1785 or 1926 and she has never taken a reservation in her career. She sold other developments for Charnley prior to selling the instant lots. One such development was on Delores Lane in Templeton. She used the same documents for that development as in the instant case, i.e., a standard features sheet, site and floor plans, and elevation plans.

Over the next year, construction did not start on any house in tract 1785. The Blackburns contacted Smith frequently for the status of the start date for construction and the reason for the delays. Smith testified that, in June of 2001, Charnley gave her a letter indicating that he could not perform the contracts on lots 1, 2 and 3. He stated that due to construction costs and delays, he could not build the homes at the prices for which he sold them.

At the end of June 2001, Charnley called a meeting with the Blackburns and Smith. At that meeting, Charnley told the Blackburns that he had failed to obtain a public report for tract 1785 from the Department of Real Estate before entering into the purchase agreement and, therefore, the agreement was neither valid nor binding. He asked the Blackburns to renegotiate the purchase price to $199,000 or, alternatively, offered to buy them out of the transaction. The Blackburns refused to renegotiate the purchase price and the meeting ended. At that time, Charnley did not mention that he believed the purchase contracts were in reality nonbinding "reservations."

Charnley then asked Smith to contact the Thomases to buy them out of their contract. A settlement was attempted with the Thomases but failed after Charnley refused to complete a provision concerning confidentiality of the transaction.

Construction finally began on the homes in approximately September of 2001. Evidence presented at trial demonstrated that, during the construction delay, the real estate market appreciated significantly. The homes were completed in approximately February of 2002. Renters were ultimately placed in the homes on lots 1 and 2 in July of 2002.

In October of 2001, the Blackburns initiated this action, and the Thomases filed suit in March of 2002. The couples concomitantly recorded notices of a pending action (lis pendens) on the properties. Charnley answered and filed a cross-complaint against Country Real Estate and Michelle Smith. The trial court consolidated the actions, severed Charnley's cross-complaint against the real estate broker and agent, and conducted a trial on the complaints.

Jeffery Thomas testified that when construction did not begin as expected on their home, he and his wife purchased a smaller, older home for a higher price. He did so for the tax advantage of owning a home. He stated that he and his wife always intended to move into their new home on lot 1 and to sell the older one.

H. Stanton McDonald, a real estate appraiser, conducted an appraisal of the Thomases' home on lot 1. As of March of 2000 (the time of purchase), he appraised the 1484 square foot home at $185,000. In December of 2000, he appraised it at $230,000. Lisa Marrs, a licensed real estate associate employed by Bjerre and Garcia Realty, testified that she conducted a rental analysis for the homes on lots 1 and 2. She opined the fair rental value of each home was between $1,350 and $1,400 per month for the entire year of 2002.

James Donegan, Sr., testified that his law firm obtained the final public report for tract 1785 in December of 2001. He testified that a reservation

instrument is routinely used to reserve a lot for future purchase until the final tract map is approved. Unlike the CAR purchase agreement executed by the parties, the reservation instrument clearly states, "This is not an offer or contract to purchase or sell."

At trial, Charnley maintained that he had simply entered into reservations for the homes on lots 1 and 2, and there was, consequently, no mutual assent or "meeting of the minds" between the parties. He also maintained the agreements could not be specifically enforced because the terms were not sufficiently certain. He testified that Michele Smith proposed taking nonbinding reservations for the lots on tract 1785. He acknowledged giving her an exclusive listing to sell the lots and that she brought him offers. He testified that she told him "it was a nonbinding agreement, as long as we didn't take any money and we didn't open up an escrow." He testified that construction delays led to increased construction costs and he could not go through with the agreements for either tract 1926 or 1785 without losing too much money.

Charnley testified that in June of 2001, he felt the lots on tract 1785 were valued at $230,000 to $240,000. He believed the house on lot 1 at the time of its completion was worth $290,000, and the square footage had increased from 1450 to 1650. He believed the house on lot 2 was worth $275,000.

After taking the case under submission, the trial court ordered specific performance of the agreements with the Blackburns and Thomases. The court found that Charnley entered into purchase contracts with these couples without first obtaining approval from the Department of Real Estate, the contracts were voidable only by the aggrieved purchasers pursuant to Government Code section 66499.32, and the buyers elected not to rescind them. The court found that the motivating factor for Charnley listing the property and obtaining residential purchase agreements was to obtain construction financing. The court disbelieved Charnley's claim of mistake concerning the effectiveness of the purchase agreements, reasoning that Charnley knew what he was doing and he did not believe the CAR purchase agreements were reservations or nonbinding agreements. The court found that he knew it was illegal to sell subdivided lands without first obtaining a final public report from the Department of Real Estate Commissioner, and he "believed he could take unfair advantage of his own failure to comply with Business and Professions Code Section 11018.2 if he subsequently elected at his whim to avoid the agreements in order to make a larger profit. [He] was wrong."

The court further found that Charnley had not relied on any representation of Michelle Smith or her supervisor, Thomas Erskine, that the purchase agreements were not binding. The court reasoned that Charnley signed exclusive listing agreements with Smith to sell the property months before he

applied for approval from the Department of Real Estate, he had the ability to seek legal advice, he chose not to do so, and allegedly relied upon a salesperson (a layperson), which was not reasonable. The court reasoned that under the objective test for contracts, Charnley's undisclosed intention of avoiding the contracts, if he chose to do so, did not prevent the formation of enforceable contracts.

The court rejected all of Charnley's defenses to the request for specific performance. The court found the contracts were sufficiently certain to support a decree of specific performance in that they were for a specified lot in a specified tract. "Although the lots were not specifically delineated by metes and bounds, they were sufficiently identified. This was open ground; the fact that a lot boundary might be a few feet one way or another was irrelevant. [¶] Smith obtained floor plans and elevations. These, along with the 'Standard Features' Sheet, which was given to both sets of Plaintiffs when they executed the agreements, gave enough detail. These were not custom homes. Plaintiffs were satisfied to accept the general specifications given them." Moreover, the court reasoned, the homes were fully constructed at the time of trial and the couples were willing to accept them "as is."

The court found the consideration for the purchases adequate at the time of contracting as demonstrated by the testimony of the appraiser. The court found that a balance of the hardships caused by granting specific performance favored the buyers, that Charnley should bear any loss caused by the delay in construction, and that the buyers were not unjustly enriched by the increased value of the real estate, because, had the sale been completed on time, they would have received the same benefit.

The court further found that the Blackburns and Thomases had tendered performance of their obligations under the purchase agreements, but Charnley had refused it. The court noted that Charnley had never notified the Blackburns or the Thomases that construction had commenced, he never asked for the deposits, he never provided the Thomases with the public report, and when the Blackburns and Thomases offered their deposits, Charnley refused to accept them.

Finally, the court determined that the Blackburns and Thomases were entitled to the lost rental value of the homes ($1,300 per month per home) from the date they were rented out (July of 2002) through the date of trial, i.e., a total of $6,500 to each couple.

The Blackburns and Thomases subsequently moved for an award of attorney's fees under the terms of their agreements. The court granted the motion, awarding the Blackburns $36,000 and the Thomases $24,000 as attorney's fees.

## Discussion

### I. *Availability of a Decree of Specific Performance*

Charnley contends the trial court erred in entering a decree of specific performance because the legal descriptions in the purchase agreements were not sufficiently certain and definite to be enforceable. Charnley argues that no legal description for the properties existed at the time the agreements were executed, there was no "metes and bounds" description, and the square footage and precise location of the lot lines could not be determined.

■ Specific performance of a contract may be decreed whenever: (1) its terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate. (Civ. Code, § 3390, subd. 5 [court may not specifically enforce "[a]n agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable"]; *Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575 [193 Cal.Rptr. 409].)

■ The material factors to be ascertained to support a contract for the sale of real property are: (1) the seller; (2) the buyer; (3) the price; (4) time and manner of payment; and (5) description of the property sufficient to identify it. (*King v. Stanley* (1948) 32 Cal.2d 584, 589 [197 P.2d 321].) In determining whether the material factors in a contract are sufficiently certain for specific performance, "the modern trend of the law favors carrying out the parties' intention through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. . . . The defense of uncertainty has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce." (*Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 500 [227 Cal.Rptr. 318], citations & fn. omitted.) ■ Parol evidence that does not vary or contradict the written terms of the contract is admissible to explain the ambiguities or give meaning and content to words used, provided it does not vary or contradict the terms of the contract. (*Id.* at p. 501.)

■ Here, the purchase agreements expressly provided that Charnley agreed to sell lots 1 and 2 on Old Country Road. The trial court admitted into evidence the standard features sheets, site plans, floor plans, elevation plans, and tract map furnished to the couples at the time of contracting to further explain the meaning of the terms. The court had no difficulty determining what was conveyed by the purchase agreements. These were "spec" homes that were completely constructed by the time of trial. As constructed, the homes were

consistent with the standard features sheet, the site and elevation plans, floor plans, and tract map. Charnley presented no evidence showing that the lots or houses were not what was essentially described in those documents. Significantly, the Van Ordens completed the purchase of lot 3 based on identically executed purchase agreements. We conclude the properly admitted extrinsic evidence rendered the description of the lots conveyed by the purchase agreements sufficiently definite for enforcement. The court did not err in ordering specific performance.

## II. *The Award of Attorney's Fees*

■ Charnley contends the trial court erred in awarding attorney's fees to the Blackburns and Thomases because they failed to satisfy a contractual condition precedent for the recovery of fees. He argues that the couples were required to mediate their claims prior to filing suit in order to preserve their right to seek attorney's fees. On appeal, we review the determination of the legal basis for an award of attorney fees de novo as a question of law. (*Leamon v. Krajkiewcz* (2003) 107 Cal.App.4th 424, 431 [132 Cal.Rptr.2d 362].)

The parties' purchase agreement provides that in any action arising out of the agreement, "the prevailing Buyer or Seller shall be entitled to reasonable attorney's fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 21A."

Paragraph 21A requires the parties to mediate their disputes prior to initiating an action to preserve the entitlement to attorney's fees. Paragraph 21A provides in pertinent part: "21. DISPUTE RESOLUTION: [¶] A. MEDIATION: Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to . . . court action, subject to paragraphs 21C and D below. . . . If any party commences an action based on a dispute or claim to which this paragraph applies, without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorney's fees, even if they would otherwise be available to that party in any such action. . . ."

Paragraph 21C sets forth exemptions to the requirement of mediation. Paragraph 21C provides in pertinent part: "The following matters are excluded from Mediation and Arbitration hereunder . . . . *The filing of a court action to enable the recording of a notice of pending action . . . or other provisional remedies, shall not constitute a violation of the mediation and arbitration provisions.*" (Italics added.)

In granting the motion for attorney's fees, the trial court ruled that the purchase agreements expressly exempted the couples from the mediation

requirement because they filed an action to enable the recording of a notice of lis pendens. Alternatively, the court ruled that any attempt to mediate the dispute would have been futile. The court reasoned: "[T]he filing of an action to enable the recording of a notice of pending action is not a violation of the mediation provision. The Blackburns filed a Notice of Lis Pendens on October 12, 2001; the Thomases filed theirs on March 27, 2002. Prudent practice dictated this result. They wanted specific performance of agreements for the purchase of real property. Had they not filed them, defendant would have been free to sell to third parties and specific performance might not have been available. [¶] Moreover, mediation was conducted pursuant to this court's practices. Although an extremely effective mediator—Judge Burke—mediated the cases after filing and before trial, he was unable to reach agreement. This is strong evidence that any attempt at mediation prior to filing would have been futile."

■ Here, the parties filed a lawsuit and recorded a lis pendens on their lots in order to protect their homes from resale to a bona fide purchaser in a booming real estate market and to preserve their right to seek specific performance. Under the plain and unambiguous provisions of the purchase agreements, they were exempt from the mediation requirement. We agree with the trial court that the couples were entitled to attorney's fees as the prevailing parties.

We reject Charnley's contention that the trial court should have made a finding, either at trial or at the attorney's fee hearing, that prior to recording their lis pendens the plaintiffs had a good faith reason to believe that Charnley was going to sell the parcels out from under them imminently. The language of paragraph 21C sets forth no such restriction in order preserve the entitlement to attorney's fees. The language expressly states that the filing of an action to enable the recording of a lis pendens is not a violation of the mediation requirement. As the Blackburns and Thomases observe, if the drafters of the standard CAR purchase agreement intended the "lis pendens" exception to apply only when an anticipatory breach is documented, the drafters could have easily said so in the agreement. (See, e.g., *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1440–1441 [64 Cal.Rptr.2d 766] [rejecting interpretation of a marital settlement agreement that would have added qualifying language to an unambiguous provision].)

*Leamon v. Krajkiewcz, supra,* 107 Cal.App.4th 424, cited by Charnley, is inapposite. There, the Court of Appeal interpreted a similar real estate purchase agreement and affirmed the trial court's order denying a seller's request for attorney's fees on the ground that the seller had failed to seek mediation prior to filing suit. *Leamon* did not address the particular clause of the purchase agreement at issue here which allows the buyers to file suit without first seeking mediation to enable the recording of a lis pendens.

Charnley also contends that the couples' right to obtain attorney's fees is negated by technical defects in their service and filing (not recording) of the lis pendens placed on each of their lots. Charnley failed to raise this argument in the court below in opposition to the motion for attorney's fees. Additionally, he failed to move to expunge the lis pendens recorded by the Blackburns and Thomases. We conclude, therefore, that Charnley has waived this issue on appeal. (*Chamberlain v. Ventura County Civil Service Com.* (1977) 69 Cal.App.3d 362, 372 [138 Cal.Rptr. 155].)

## III. *The Statement of Decision*

At the conclusion of trial, the court took the case under submission and issued a tentative decision. In the tentative decision, the court rejected Charnley's defenses and stated in part: "Alleged negligence of broker/agents. [¶] If defendant has been damaged by failure of Country Real Estate to live up to the standard of care of the industry, he can pursue it in his cross-complaints." Charnley then requested a statement of decision answering the question whether the negligence of the parties' dual real estate agent could be imputed to the buyers to defeat specific performance.

In response, the trial court issued a final statement of decision, including the following language on page 7 at lines 14 through 19: "The Defendant failed to establish at trial that his broker or agent failed to meet the applicable standard of care in the industry. If defendant feels he has been damaged by the alleged failure of Country Real Estate to live up to the standard of care of the industry, he can pursue it in his cross-complaints." Charnley subsequently objected to this language, but the court did not rule on the objection.

Charnley contends the trial court erred by inserting the above language into the final statement of decision because no evidence was presented at trial as to the standard of care owed by a real estate agent. Charnley argues that the language was inserted by opposing counsel and the court never actually made such a finding. Charnley contends that he is prejudiced by the inclusion of this language in the statement of decision because it will have collateral estoppel effect on the negligence claim raised in Charnley's cross-complaint pending below against the real estate broker and agent. Charnley asks that we modify the trial court's statement of decision and judgment to remove this unintended language.

We conclude that Charnley is not prejudiced by the language on page 7, lines 14 though 19. The language states only that Charnley "failed to establish at trial that his broker or agent failed to meet the applicable standard of care." This is not a finding that the real estate broker or agent *met their standard of care*. Because the standard of care of a real estate broker or agent

was not at issue in the trial, the trial judge simply advised Charnley that if he feels he "has been damaged by the alleged failure of Country Real Estate to live up to the standard of care of the industry, he can pursue it in his cross-complaints." We conclude that the above language will not have any collateral estoppel effect on the negligence claim asserted by Charnley in its cross-complaint against Country Real Estate and/or the real estate broker and agent.

Accordingly, the judgment and postjudgment order awarding attorney's fees are affirmed. Costs on appeal are awarded to the Blackburns and Thomases.

Gilbert, P. J., and Perren, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 21, 2004.