[No. B186055. Second Dist., Div. Six. July 2, 2008.]

UNION OIL COMPANY OF CALIFORNIA, Plaintiff and Respondent, v. GREKA ENERGY CORPORATION et al., Defendants and Appellants.

Counsel

Valle & Associates and Jeffrey B. Valle for Defendants and Appellants.

Andre, Morris & Buttery, James C. Buttery and Kevin D. Morris for Plaintiff and Respondent.

Opinion

**GILBERT, P. J.**—This case illustrates that in contract disputes concerning oil wells, damages can be an inadequate remedy.

Defendants Greka Energy Corporation, Saba Petroleum Company, a Delaware corporation, Saba Petroleum, Inc., Saba Energy of Texas, Saba Petroleum, a Colorado corporation, Saba Petroleum, Inc., a Texas corporation, Greka CA, Inc., Greka SMV, Inc., Greka Integrated, Inc., Greka Realty, Greka AM, Inc., and Santa Maria Refining Company (collectively Greka) appeal a judgment ordering specific performance of Greka's contractual obligation to plaintiff Union Oil Company of California (Unocal) to plug and abandon idle oil wells on Greka's property. We conclude the trial court properly granted specific performance; and Unocal's action is not barred by the statute of limitations. We affirm.

## FACTS

Between 1992 and 1995, Unocal sold several oil fields to other oil companies. Each contract and grant deed required the buyer to plug and abandon all idle or nonproductive oil wells within designated time schedules. " 'Plug' and 'abandon' are terms of art which . . . describe the procedure that must be followed when a well is no longer used, to ensure that it does not pose a hazard to safety or the environment." (*Wells Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 604 [61 Cal.Rptr.2d 826].) If the buyer did not meet the abandonment time schedules, Unocal retained the right to reenter the fields, plug and abandon the idle wells and charge the buyer the costs for that activity.

In 1999, Greka acquired the oil companies which bought the oil fields from Unocal. It took possession of the fields and began drilling operations. But it did not comply with the plugging and abandonment time schedules.

On July 7, 2000, Unocal's counsel wrote to the Connecticut Surety Corporation, Greka's bonding company, stating that Unocal was making a claim against the performance bond because of noncompliance with the schedules. Greka responded with a request that Unocal withdraw its claim because Greka wanted to amend the contracts and negotiate a new "business strategy" on oil well production. The parties met several times. Greka promised to provide a written proposal for amending the contracts.

On August 19, 2002, Unocal notified Greka that it had deferred taking legal action against it while the parties discussed a resolution. But Greka did not submit the promised written proposal for amending the contracts. Unocal told Greka it had two options: (1) submit the written proposal within 30 days, or (2) plug and abandon the idle wells. If it failed to select either option Unocal would proceed to enforce its legal rights.

On December 31, 2002, Unocal filed an action against Greka for breach of contract, injunctive relief and specific performance. Unocal said in its complaint, "The performance bonds that secured [Greka's] obligations have been cancelled because the bonding company is being liquidated by the State of Connecticut. Unocal is seeking to enforce the contractual obligations regarding abandonment and remediation of the oil fields . . . ."

At trial, Roy Priest, a former Unocal petroleum engineer, testified that Unocal had potential liability for the hazardous substances in the oil fields it sold. The law requires oilfield operators to plug and properly abandon idle oil wells. This process includes removing the well's concrete pad, cleaning the area around the well, soil reconstruction, and obtaining "closure" approval from regulatory agencies. Unocal required the buyers to provide "financial assurance" that they could meet the requirements and time limits for removing nonproductive wells. But performance bonds and indemnity agreements only gave Unocal partial protection from potential environmental liability.

Marlon Brown, a contract negotiator for the initial buyers, testified that the purchase price of the oil fields was related to the number of idle wells. He said, "Unocal would reduce the purchase price more readily than they would reduce the number of wells to be plugged, so it seemed like the liability issue was of prime importance."

William Brannon, a district director of California's Division of Oil, Gas and Geothermal Resources, testified that idle oil wells deteriorate. This could lead to oil and gas contamination of the ground water. If these wells are not properly plugged there could be a leakage of gas or petroleum coming to the surface.

The trial court found that Greka breached its contract by not plugging and abandoning idle oil wells and that Unocal was entitled to specific performance. It ordered Greka to plug and abandon 47 oil wells over a five-year period. It rejected Unocal's request to enter Greka's fields to remove the idle wells because it found that could interfere with Greka's operations. It also rejected Greka's claim that the statute of limitations barred part of the relief sought by Unocal.

## DISCUSSION

### I. *Specific Performance*

■ Greka contends the trial court erred by ordering specific performance. We disagree. "Specific performance of a contract may be decreed whenever: (1) its terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate. [Citations.]" (*Blackburn v. Charnley* (2004) 117 Cal.App.4th 758, 766 [11 Cal.Rptr.3d 885].)

■ Greka contends that Unocal has an adequate legal remedy for damages which precludes specific performance. But here the agreement involved the sale of real property. There is a presumption "that the breach of any agreement to transfer real property cannot be adequately compensated for by money damages." (*BD Inns v. Pooley* (1990) 218 Cal.App.3d 289, 296, fn. 12 [266 Cal.Rptr. 815].) This presumption extends to agreements containing covenants to maintain the property in a specified condition. (*Ellison v. Ventura Port District* (1978) 80 Cal.App.3d 574, 579 [145 Cal.Rptr. 665].)

In *Ellison*, the Court of Appeal held that a trial court could order a public port district to comply with a covenant to periodically dredge a harbor channel. It rejected the argument that specific performance could not be granted because damages were the adequate remedy. The court said, "The covenant requiring District to build and maintain the navigation and drainage channel enhanced the value of the land retained by the original landowners and was a material factor which induced them to transfer the land on which the Marina was later built, at the price offered by District. The maintenance clause cannot be separated from the total transaction which was a contract to sell land. A presumption exists that the remedy at law is inadequate . . . . [Citations.]" (*Ellison v. Ventura Port District, supra,* 80 Cal.App.3d at pp. 579–580.)

■ Here the trial court found that damages were an inadequate remedy. It noted that the agreement to abandon idle wells was a critical element in the land sales agreement between the parties. The court said, "Unocal bargained for wells to be plugged and abandoned and soil to be remediated in an obvious effort to avoid future liability to regulatory agencies and landowners." It found that Unocal obtained these promises to comply with these environmental standards "as part of the consideration for the contracts."

Here, as in *Ellison*, the "maintenance clause cannot be separated from the total transaction . . . ." (*Ellison v. Ventura Port District, supra*, 80 Cal.App.3d at p. 579.) The environmental standards were incorporated into the title. The grant deeds gave Unocal the right to enter the oil fields and perform the environmental remediation at Greka's expense if Greka defaulted. But the trial court found that ordering Greka to perform its obligations was a better remedy. It said, "Requiring Defendants to perform the abandonment and necessary remediation work is vastly [preferable] to allowing [Unocal] to enter Defendants' fields and potentially interfere with ongoing operations."

■ The trial court properly relied on *Ellison*. *Ellison* represents the modern view that a party entitled to specific performance of a continuing duty should receive it "whenever it is practically feasible." (See 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 45, p. 337; see also *McDonald v. Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 443 [111 Cal.Rptr. 637] [Secretary of Transportation could seek specific performance to order transit district to build 20 structures].)

■ Commentators and courts have recognized the inadequacy of damages for breaches of oilfield cleanup agreements and have concluded that specific performance is generally appropriate. (*Union Oil Co. of California v. Leavell* (7th Cir. 2000) 220 F.3d 562, 566; 25 Williston on Contracts (2007 supp.) § 67:111, p. 2.) As stated by the Seventh Circuit, "Specific performance was an appropriate remedy. Unocal bargained for a clean site . . . to avoid a risk of liability . . . . Damages cannot produce that surety." (*Union Oil Co. of California, supra*, at p. 566.)

California courts have used equitable decrees to order the plugging and abandonment of oil wells to protect property interests. (*Hancock Oil Co. v. Meeker-Garner Oil Co.* (1953) 118 Cal.App.2d 379, 381 [257 P.2d 988]; *Union Oil Co. of Cal. v. Domengeaux* (1939) 30 Cal.App.2d 266, 267 [86 P.2d 127].) This state also encourages prompt compliance with environmental

standards. (*Dominquez Energy v. County of Los Angeles* (1997) 56 Cal.App.4th 839, 856 [65 Cal.Rptr.2d 766].) Idle wells present multiple risks. "It is undoubtedly in the best interests of the citizens of this state to have these wells properly plugged and abandoned as soon as possible in order to prevent any further harm to the environment. Consequently . . . a responsible party . . . should be required to perform the required tasks." (*Wells Fargo Bank v. Goldzband, supra,* 53 Cal.App.4th at p. 619.)

Specific performance is the most direct means to remedy the breach and protect the environment. It requires that Greka comply with its legal duties. The contracts gave notice of these obligations and "are designed to allocate" the risks. (*Union Oil Co. of California v. Leavell, supra,* 220 F.3d at p. 566.) Moreover, where a party, as here, commits multiple breaches, specific performance is preferred. over the inadequate remedy of repetitive future damage actions. (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575–577 [193 Cal.Rptr. 409]; *Ellison v. Ventura Port District, supra,* 80 Cal.App.3d at p. 579.)

■ Greka contends Unocal had to prove monetary damages to obtain specific performance. But Unocal had the choice of remedies; specific performance or damages for breach. (*BD Inns v. Pooley, supra,* 218 Cal.App.3d at p. 296.) "[A] party may not obtain both specific performance and damages for the same breach of contract . . . ." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 905 [123 Cal.Rptr.2d 432, 51 P.3d 297].) "[T]he fact [the plaintiff] may have suffered no monetary damage would not defeat [the plaintiff's] right to specific performance." (*Remmers v. Ciciliot* (1943) 59 Cal.App.2d 113, 120 [138 P.2d 306]; see *Tamarind Lithography Workshop, Inc. v. Sanders, supra,* 143 Cal.App.3d at p. 576 [fact that damages may be "impossible, to quantify in monetary terms" does not bar specific performance]; *Henderson v. Fisher* (1965) 236 Cal.App.2d 468, 473 [46 Cal.Rptr. 173]; see also *Union Oil Co. of Cal. v. Domengeaux, supra,* 30 Cal.App.2d at p. 270 [injunction to abandon oil well was proper even though plaintiffs conceded their inability to prove "an award of damages in any specific amount"].)

Moreover, here the trial court found that Unocal suffered damages because of Greka's failure to perform. From Brown's and Priest's testimony it could reasonably infer that Unocal lowered its purchase price relying on the agreement to plug and abandon idle wells. When that did not occur, Unocal lost the benefit of its bargain. Greka's breach also caused another type of injury. (*County of Los Angeles v. Margulis* (1935) 6 Cal.App.2d 57, 59–60

[44 P.2d 608].) It forced Unocal to assume responsibility for environmental remediation, "a condition which would not exist" if Greka had not breached its obligations. (*Id.* at p. 59.) Unocal had to monitor Greka's noncompliance to protect Unocal's financial interests.

Greka contends Unocal's fears about harm from idle oil wells are imaginary. But from Brannon's testimony the trial court could reasonably infer that the large number of idle wells pose risks of ground water contamination and oil and gas leaks which endanger neighboring properties, the public and the environment. (*Wells Fargo Bank v. Goldzband, supra,* 53 Cal.App.4th at p. 619.) It subjects Unocal to a substantial and continuing exposure to third party liability. (*Ibid.*; *Carson Harbor Village, Ltd. v. Unocal Corp.* (C.D.Cal. 2003) 287 F.Supp.2d 1118, 1178, fn. 250; *Boeing Co. v. Cascade Corp.* (9th Cir. 2000) 207 F.3d 1177, 1187–1188; *U.S. v. Reaves* (M.D.Fla. 1996) 923 F.Supp. 1530, 1534.) Unocal, concerned about its responsibilities and public image, contracted to guarantee environmental safety. The fields it formerly drilled are a matter of public record. Unocal has the right to expect that they will not deteriorate into environmental disasters and harm its reputation. (*Kellogg Co. v. Exxon Mobil Corp.* (W.D.Tenn. 2001) 192 F.Supp.2d 790, 810 [Exxon had to "resuscitate its public image" after the Exxon Valdez oil spill].) Unocal contracted for elimination of a palpable risk.

Greka claims there have been "huge" increases in oil prices and consequently some of the idle wells are now economically viable for drilling. It contends the public interest is harmed by "forever sealing wells which have great future economic value . . . ." It argues that the breach here is an "efficient" breach, or a "good" breach, if you will. This philosophical notion that the rules change in a changing environment is of little use to Unocal should contamination occur in an unplugged well.

But Greka is correct to the extent that changed circumstances occurring after judgment may justify modifying an equitable decree. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 851 [39 Cal.Rptr.2d 21, 890 P.2d 43]; *Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767 [195 Cal.Rptr. 417].) Here the trial court anticipated such a possibility. It retained jurisdiction to "alter the order and/or location of these abandonments." The judgment was entered in 2005. The record does not reflect whether there have been changes in oil markets, the environment and technology which effect the abandonment schedule. The trial court has discretion to consider whether changed circumstances following its 2005 judgment require modification or reduction in the number of wells to be abandoned or recalculation of the abandonment schedules.

## II. *Statute of Limitations*

Greka contends Unocal's action is partially barred by the four-year statute of limitations. Unocal claims its action is timely because the statute of limitations was tolled and Greka is estopped to assert the statute of limitations. We agree.

■ The statute of limitations for an action on a written contract is four years. (Code Civ. Proc., § 337.) Greka argues that some of Unocal's breach of contract claims arose in 1997, but because Unocal did not file suit until 2002, relief for those claims is barred.

In July 2000, Unocal filed a claim against Greka's performance bond. But Greka urged Unocal to withdraw its claim because of Greka's new "business strategy" on well management. It said it wanted to amend the current agreements to reflect the new "strategy," and that a settlement would benefit Unocal.

In November 2000, Greka also wrote to its bonding company urging it to withhold action on "Unocal's claim" because "[it] is diligently pursuing a resolution with Unocal . . . ." It stated, "We are highly confident that [we] can resolve the foregoing matters with Unocal without involving the surety and the performance bonds."

Greka had several settlement meetings with Unocal and promised to provide Unocal a written proposal for amending the agreements. Unocal filed its action after Greka did not submit that proposal. At that point it became evident to Unocal that settlement was no longer possible.

■ Greka claims Unocal's action is untimely. But the limitations period was tolled when Unocal filed its claim and Greka requested settlement negotiations. (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1355 [65 Cal.Rptr.3d 524].) Greka is also estopped from asserting the statute of limitations as a defense. It urged the bonding company and Unocal to suspend legal actions. They did, and they relied on Greka's promise to amend the contracts. Defendants who induce plaintiffs not to sue pending settlement, as here, may not assert a statute of limitations defense where their conduct caused the untimely filing of the action. (*Cordova v. 21st Century Ins. Co.* (2005) 129 Cal.App.4th 89, 96 [28 Cal.Rptr.3d 170].) Moreover, Unocal acted reasonably by delaying litigation pending completion of settlement negotiations. "Where a potential defendant has promised to remedy a portion of the damages suffered by the plaintiff, it would be unreasonable to expect the plaintiff to jeopardize the possibility of repair by filing a lawsuit . . . ." (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 [21 Cal.Rptr.2d 110].)

We have reviewed Greka's remaining contentions and conclude they are without merit.

The judgment is affirmed. Costs on appeal are awarded to respondent.

Coffee, J., and Perren, J., concurred.